**United States District Court**
For the Northern District of California

**\*E-Filed 1/24/12\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

HIGH SIERRA HIKERS ASSOCIATION,                No. C 09-04621 RS

        Plaintiff,

   v.                                **ORDER GRANTING IN PART AND
                                         DENYING IN PART CROSS-
                                         MOTIONS FOR SUMMARY
                                         JUDGMENT**

UNITED STATES DEPARTMENT OF
THE INTERIOR, et al.,

        Defendants.

_____/

## I.  INTRODUCTION

This case challenges administrative actions and land management practices which allegedly impact the level of stock use in the Sequoia and Kings Canyon National Parks ("SEKI").  Plaintiff High Sierra Hikers Association ("HSHA") asserts that defendants violated both the Wilderness Act and the National Environmental Policy Act ("NEPA") by issuing a General Management Plan ("GMP") which permits the use of horses and mules in wilderness areas without conducting the proper environmental assessment of the impact of such stock use.  The parties have filed cross-motions for summary judgment.  For the reasons set forth below, plaintiff's motion for summary judgment is granted in part and denied in part as is defendants' cross-motion for summary judgment. In issuing the Packer Permits and approving the GMP, the NPS violated the Wilderness Act by failing to conduct the requisite specialized finding, but complied with NEPA by fulfilling the Act's

1  procedural requirements.

2                                II.  RELEVANT FACTS

3        The National Park Service ("NPS") jointly administers SEKI as a single unit of the National

4  Park System under a Congressional mandate to protect the parks and comply with the provisions of

5  NEPA and the Wilderness Act.  *See* 16 U.S.C. §§ 41, 43, 80.  While NEPA applies throughout

6  SEKI, the Wilderness Act provides extra protection to the parks' designated wilderness areas.  Over

7  the past forty years, the NPS has issued a number of management plans for SEKI.  It presented the

8  SEKI Master Plan ("MP") in 1971 with the stated objective, among others, to "phase[] out as

9  conditions permit" the use of livestock in the higher elevations for any purpose.  (GMP 000310).

10 This objective, based on the NPS's concern over "damage resulting from livestock," was never

11 implemented.  (*Id.*).  Notably, the MP did not meet the requirements of a general management plan

12 and was developed absent public involvement.  According to the GMP, the MP is therefore outdated

13 with recommendations for "some actions [which] are no longer appropriate."  (GMP 0020243).

14       Over a decade after issuance of the MP, the NPS approved two new plans, the Stock Use and

15 Meadow Management Plan ("SUMMP"), and the Backcountry Management Plan ("BMP").  These

16 plans were prepared with public input and accompanied by Environmental Assessments ("EAs").

17 They limited stock to twenty per party and provided a number of management practices to mitigate

18 the adverse effects of stock use.  The parties largely dispute the breadth and impact of these plans.

19 The HSHA contends that neither plan made the requisite findings of necessity to permit commercial

20 stock in SEKI.  In this regard, plaintiff asserts that the SUMMP and the BMP merely presented a

21 few general practices and did little to mitigate the impact of stock usage.  Consequently, the plans'

22 inadequate monitoring systems only provided means for the NPS to alter stock levels in response to

23 destructive impacts.

24       Defendants contest this analysis, arguing that both plans are fully NEPA compliant and

25 provide detailed guidance for protecting meadows and managing stock use.  For support, defendants

26 describe each plan's effects in detail: The SUMMP implemented a policy change from the MP by

27 no longer seeking to phase out stock use at upper elevations.  Additionally, the SUMMP established

28 specific protections for park meadows and delineated permissible grazing areas.  As a final measure,

the SUMMP created an elaborate monitoring program to scrutinize the impact of stock grazing on

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

the park meadows.  The BMP, alternatively, focused on the backcountry areas of SEKI, asserting as one of its management objectives, the allowance "to the extent possible—pack and saddle stock . . . at the same levels and patterns that have occurred in recent past years unless information from the monitoring system indicates need for change."  (GMP 0027935).  Together, defendants maintain that the plans provide "a sound scientific base" for managing stock use. Defendants also note that in 1994, SEKI engaged a full-time plant ecologist to oversee the SUMMP and to summarize monitoring results.  In conjunction with the various monitoring programs carried out by both the wilderness rangers and the commercial and administrative users, defendants insist that the SEKI staff and management team have a sound scientific base on which to ground meadow-related resource protection decisions.

A.  <u>The General Management Plan</u>

In 1997, the NPS began preparing the GMP at issue.  The agency drafted an Environmental Impact Study ("EIS"), held public hearings, received public comment, and issued a Final EIS which became the 2007 GMP.  The GMP's stated purpose "is to establish a vision for what Sequoia and Kings Canyon National Parks should be, including desired future conditions for natural and cultural resources, as well as visitor experiences."  (GMP 0020269).  Importantly, it adopted the Draft EIS's Preferred Alternative of allowing stock use up to "current levels."  (GMP 0020247).  Defendants emphasize that the GMP simply offers a broad programmatic direction for SEKI, providing guidelines to park management not only on stock use, but also on matters ranging from light pollution to visitor accessibility—issues largely unrelated to stock.  In support of the assertion that the GMP is simply a programmatic document, defendants invoke language from the Record of Decision ("ROD") which implemented the GMP.  The ROD stated that, following the GMP, a stock-related Wilderness Stewardship Plan ("WSP") "will be developed—with formal opportunities for review and comment as well as informal public meetings—to regulate use and protect wilderness values . . . [N]o installation of new structures nor any new commercial activities will be undertaken until after [the WSP's] approval."  (GMP 0021661-62).  Consistent with this assertion, the NPS published a Notice of Intent to Prepare an EIS for the WSP on April 26, 2011, characterizing the goal as "an implementation level plan, [that] will provide guidance on a variety of issues including . . . stock use."  76 Fed. Reg. 23335.  From this language, defendants insist that the GMP is not the

United States District Court

For the Northern District of California

1    implementation plan.  Rather it simply provides guidelines without affecting stock levels in any

2    way.  Only upon completion of the WSP, they argue, will the NPS determine whether substantial

3    changes to stock use are necessary.

4         The HSHA disagrees with defendants' characterization of the GMP as a programmatic

5    document.  Rather, it asserts that the GMP not only continues stock use at "unidentified" current

6    levels, but also provides for the expansion and enhancement of facilities for stock users.  The GMP

7    thus cannot be characterized as a programmatic plan, but rather an implementation plan with site-

8    specific effects.   The HSHA further contends that the NPS's assurances that  it will conduct the

9    requisite needs assessment in a future, more specific WSP is unreliable and insufficient to

10   demonstrate that the NPS has complied with either the Wilderness Act or NEPA.  Based on these

11   facts, plaintiff filed an action asserting that defendants violated the Wilderness Act and NEPA in

12   adopting the GMP without adequately assessing environmental impacts.[1]

13        B.  Packer Permits

14        The HSHA also claims that defendants violated the Wilderness Act and NEPA by continuing

15   to issue Packer Permits without first developing more stringent environmental protections in either

16   the GMP or in an alternative plan.  Packer Permits refer collectively to the commercial use

17   authorizations (CUAs) granted annually to stock operators and to the renewal permit issued to the

18   one stock operator located in the parks.  Before SEKI staff can issue a CUA, the requesting

19   commercial operator must submit proprietary information about the business and agree to certain

20   conditions.  One such condition is a commitment to adhere to the stock use restrictions established

21   both by the SUMMP and the conditions of that particular year.  The specific restrictions for each

22   year are derived from a compilation of monitoring data, employee observation, stock use reports,

23   and an evaluation of overall meadow conditions.  The HSHA insists that these procedures are

24   deficient and constitute an "about-face" of the NPS's original promise to conduct additional

25   environmental study before renewing any permits.  Relying on twenty-year-old EAs conducted for

26   the SUMMP and the BMP, plaintiff contends, is insufficient under both the Wilderness Act and

27

28   _____

[1] In the Complaint, plaintiffs also assert a claim under the Organic Act.  They do not address this claim, however, in either their motion for summary judgment or in their opposition to defendants' cross-motion for summary judgment.  Defendants, therefore, request that the Court conclude plaintiff has abandoned this claim.  Plaintiffs do not object to this request.

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

4

United States District Court

For the Northern District of California

1 NEPA.  Furthermore, according to plaintiff, the NPS cannot escape liability by insisting that the

2 requisite "more extensive review and analysis" for issuing permits in upcoming years will occur in

3 the detailed WSP.

4       Plaintiff brings a motion for summary judgment asserting that the NPS violated: (1) The

5 Wilderness Act by issuing Packer Permits and approving the GMP without conducting the type of

6 specialized finding required under the Act; and (2) NEPA by issuing Packer Permits and approving

7 the GMP before adequately assessing the environmental impacts of the increase in stock use.

8 Defendants respond with a cross-motion for summary judgment asserting that the GMP is a

9 programmatic document and part of a tiered planning approach and that they are therefore permitted

10 to defer both specialized findings and a full environmental impact assessment as to stock use until a

11 later stage.  Defendants further maintain that in issuing CUAs they did not violate NEPA.  With

12 regards to Packer Permits and the Wilderness Act, however, defendants concede that they failed to

13 conduct the requisite specialized findings.[2]

14                          III.  LEGAL STANDARD

15       A.  Summary Judgment

16       Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall

17 be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

18 file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

19 and that the moving party is entitled to a judgment as a matter of law."  The party who seeks

20 summary judgment bears the initial responsibility of identifying an absence of a genuine issue of

21 material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies this

22 initial burden, it shifts to the non-moving party to present specific facts showing that there is a

23 genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  "Only disputes over facts

24 that might affect the outcome of the suit under governing law" are material.  *Anderson v. Liberty*

25 *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue exists if the non-moving party presents

26
27
28

---

[2] Defendants also bring a motion for relief from the nondispositive pretrial order of a Magistrate Judge.  In this motion they contest the Judge's order granting in part and denying in part plaintiff's motion to augment and supplement the administrative record.  Specifically, they object to the admission of four of the fifty documents submitted pursuant to the order—Documents 8, 9, 10, and 42.  This Order granting in part and denying in part parties' cross-motions for summary judgment does not rely on any of these documents.  Defendants' objections are therefore immaterial and need not be resolved.

1    evidence from which a reasonable factfinder, viewing the evidence in the light most favorable to

2    that party, could resolve the material issue in his or her favor.  *Id.* at 248-49.

3            B.  Administrative Procedures Act

4            Plaintiffs bring this challenge under the Wilderness Act and NEPA pursuant to the

5    Administrative Procedure Act ("APA").  Under the APA, a court may overrule a final agency action

6    only if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the

7    law."  5 U.S.C. § 706.  While the arbitrary and capricious standard is "narrow," judicial review

8    under the APA "must not 'rubber-stamp' . . . administrative decisions that [are] inconsistent with a

9    statutory mandate or that frustrate the congressional policy underlying a statute."  *Ocean Advocates*

10   *v. United States Army Corps of Eng'rs.*, 361 F.3d 1108, 1118 (9th Cir. 2004) (quoting *Ariz. Cattle*

11   *Growers' Ass'n v. United States Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001)).  Thus, in

12   assessing challenges brought under the Wilderness Act and NEPA, once a court is "satisfied that a

13   proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is

14   at an end."  *Oregon Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997) (quoting *Idaho*

15   *Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992) (citations omitted)).

16                                   IV.  DISCUSSION

17           A.  The Wilderness Act

18           The HSHA asserts that the NPS violated the Wilderness Act by failing to conduct the

19   requisite finding of necessity before authorizing commercial services in the wilderness.  The

20   HSHA's argument pertains to both the overall GMP and to the NPS's issuance of Packer Permits.

21   The NPS concedes that it has not yet conducted the type of specialized finding of necessity

22   envisioned by the Ninth Circuit.  In this regard, it admits that it violated the Wilderness Act in

23   issuing the Packer Permits and submits that plaintiff's summary judgment motion should be granted

24   on this issue only.  With respect to the GMP, however, the NPS insists that a specialized necessity

25   finding is premature because the Ninth Circuit only requires such a finding for binding

26   implementation documents.  The GMP, the NPS maintains, is merely a programmatic plan intended

27   to provide management guidance, not to implement decisions.

28           The Wilderness Act was enacted with the purpose of preserving and protecting the

     wilderness in its natural condition.  *See* 16 U.S.C. § 1131(c).  With this in mind, the Act charged the

     ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

                                                                                          6

**United States District Court**
For the Northern District of California

1  NPS and other agencies, to promulgate regulations which ensure that "wilderness values will be

2  dominant."  36 C.F.R. § 293.2(c).   Furthermore, the Act largely prohibits commercial enterprises in

3  wilderness areas, authorizing them only "to the extent necessary for activities which are proper for

4  realizing the recreational or other wilderness purposes of the areas."  16 U.S.C. § 1133(d)(5).

5  Interpreting this language, the Ninth Circuit has held that "the statutory scheme requires, among

6  other things, that the assigned agency make a finding of 'necessity' before authorizing commercial

7  activities in wilderness areas."  *High Sierra Hikers Ass'n. v. Blackwell*, 390 F.3d 630, 646 (9th Cir.

8  2004) ("[A] finding of necessity is required, but not wholly sufficient.").  This finding must be

9  "specialized" and permit commercial activities "no more than [is] necessary to achieve the goals of

10  the Act."  *Id.* at 647 (describing the goals of the Act as preserving the wilderness and providing the

11  public with access to its natural condition).

12      In instituting this requirement, *Blackwell* recognized that the agency must balance many

13  competing interests in making a necessity finding.  *Id.* at 647; *see Wilderness Watch, Inc. v. U.S.*

14  *Fish and Wildlife Serv.*, 629 F.3d 1024, 1033, 1039, 1040 (9th Cir. 2010)) ("The Wilderness Act

15  requires a delicate balancing between Congress' desire to maintain [untouched lands, and its] . . .

16  recognition that such an idealistic view is subject to some practical limitations.").  Consequently,

17  courts must generally defer to the agency's chosen "form or content" for conducting the specialized

18  finding, ensuring only that the agency has adequately considered the potential consequences of the

19  commercial activity.  *Blackwell*, 390 F.3d at 645, 648 (enforcing the "agency's obligation under the

20  Wilderness Act to protect and preserve wilderness areas").  Despite this deference to the agency's

21  chosen form, courts have emphasized that the prohibition against commercial activity is "one of the

22  strictest prohibitions of the Act."  *Californians for Alternatives to Toxics v. U.S. Fish and Wildlife*,

23  No. CIV. S–10–1477 FCD/CMK, 2011 WL 3915966, at *20 (E.D. Cal. Sept. 6, 2011) (citing

24  *Wilderness Watch, Inc.*, 629 F.3d at 1040).  Thus, if an agency determines that a commercial use

25  should trump the Act's general policy of wilderness preservation, it has the burden of showing the

26  court that, in balancing competing interests, it prepared the "requisite findings" of necessity.  *Id.* at

27  *21; *see High Sierra Hikers Ass'n v. U.S. Forest Serv.*, 436 F. Supp. 2d 1117, 1131 (E.D. Cal. 2006)

28  ("[W]hen there is a conflict between maintaining the primitive character of the area and between

   any other use . . . the general policy of maintaining the primitive character of the area must be

United States District Court
For the Northern District of California

1    supreme."); *see also Wolf Recovery Found v. U.S. Forest Serv.*, 692 F. Supp. 2d 1264, 1268 (D.

2    Idaho 2010).

3          The HSHA argues that it is entitled to summary judgment because the NPS acknowledges it

4    did not make the requisite specialized necessity findings for the GMP.  The NPS responds that the

5    absence of such a finding does not render the GMP invalid.  Rather, it contends that *Blackwell* and

6    the Act's necessity finding requirement only apply to binding agency decisions which expressly

7    permit commercial activity, not to programmatic plans like the GMP, which merely provide

8    guidance as to a variety of issues respecting park management.[3]  Unlike the plan considered in

9    *Blackwell*, the NPS emphasizes, the GMP "does not permit any operator to *provide* commercial

10   services in the wilderness, but merely *authorizes* continuing use up to current levels, subject to the

11   regulatory and permitting review process."  (Def's. Cross-Mot. for Summ. J. at 8) (emphasis added).

12   Defendants stress that pursuant to the GMP, the NPS will not authorize new types of commercial

13   activities until a full necessity finding is completed in the WSP.  Until that time, the NPS will

14   simply continue to issue commercial permits by the same methods, and at the same levels, as before

15   the GMP was issued.

16         The NPS bases much of its argument on the difference between "*providing* commercial

17   services" and "*authorizing* continuing use of [existing] commercial services."  While the WSP in

18   *Blackwell* permitted commercial activity, the GMP here only authorizes stock use at current levels.

19   No such distinction, however, exists in either the language of the Wilderness Act or Ninth Circuit

20   precedent.  In fact, *Blackwell* explicitly declined to differentiate, for purposes of the Wilderness Act,

21   between an agency maintaining current levels of commercial activity and increasing such activity.

22   Rather, the Court, in holding that the Forest Service did not conduct an adequate necessity test,

23   stated that "[a]t best when the Forest Service simply continued preexisting permit levels, it failed to

24   balance the impact that level of commercial activity was having on the wilderness character of the

25    

26   [3] At oral argument, the NPS emphasized that *Blackwell* is inapposite because there the Court was
     considering an implementation document.  At no point, defendant asserts, has the Ninth Circuit

27   required a necessity finding under the Wilderness Act for a programmatic document such as the
     GMP.  The NPS, however, puts too much emphasis on this distinction; the *Blackwell* Court

28   provided little discussion as to whether the Forest Service's purported plan was binding or merely
     advisory.  Rather, the Court focused on the environmental impact of the agency's plan and whether
     the agency had completed the requisite balancing.  As stated, per the NPS's own concession, it has
     failed to complete this balancing.

United States District Court
For the Northern District of California

1    land.  At worst, the Forest Service elevated recreational activity over the long-term preservation of

2    the wilderness."  390 F.3d at 647-48.  As evident from this language, it was immaterial to the Court

3    whether the agency was escalating the amount of commercial activity or simply maintaining activity

4    at its preexisting levels.  What was material to the Court's analysis, however, was whether the

5    agency balanced all relevant factors and potential consequences in permitting continued commercial

6    activity.  Such balance is essential, the Court stated, because the agency's primary responsibility is

7    to protect the wilderness, not cede to commercial needs.  An agency can only override this

8    responsibility and promote competing interests such as those related to commercial activity, if it first

9    engages in a "comparative and qualitative analysis where the variables are considered in relation to

10   one another and the interests at stake are weighed."  *Californians for Alternatives to Toxics*, 2011

11   WL 3915966, at *25 (citing *Blackwell*, 690 F.3d at 646).  Once this analysis is complete, "the

12   administering agency must determine the most important value and [justify] its decision to protect

13   that value."  *Id.* at *21 (quoting *Blackwell*, 690 F.3d at 646).  Thus, contrary to the NPS's assertions,

14   the crucial inquiry is not whether the agency is increasing or maintaining—permitting or

15   authorizing—current levels of commercial activity, but rather whether the agency has conducted a

16   sufficient comparative and qualitative analysis.

17           Here, the NPS admits to promulgating the GMP without this requisite balancing.  It does not

18   argue that its analysis was adequate or that its evaluation concluded that preexisting commercial

19   activity was necessary.  Rather, it simply states that the agency is currently conducting a finding of

20   necessity and a determination is forthcoming in a WSP.  In the meantime, however, by the NPS's

21   own admission, the GMP is providing guidance to wilderness management on a "wide array of

22   issues."  This "guidance" is partially based on the GMP's findings with regards to commercial use,

23   the very findings that have yet to be subjected to the requisite determination of necessity.  This

24   constitutes a direct violation of the Wilderness Act as interpreted in *Blackwell*.  As that precedent

25   mandates, the NPS must balance these new "wide array of issues" and their potential consequences

26   with the effects of preexisting levels of commercial activity.

27           The NPS's stated intention to complete the necessary balancing in a forthcoming WSP is

28   similarly insufficient.  Moreover, the fact that the NPS has committed to forego authorizing new

     types of commercial activities until after the WSP is inadequate.  *Blackwell*, 390 F.3d at 647-48.

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

9

1    The NPS has issued a GMP which, programmatic or not, at the very least, provides for the

2    continuation of stock use at its current levels.  Pursuant to the Wilderness Act, a necessity finding is

3    required.[4]  Because the NPS has yet to complete this finding, the GMP violates the Act.[5]

4              B.  National Environment Policy Act

5              NEPA is a procedural statute which does not "mandate particular results but simply provides

6    the necessary process to ensure that federal agencies take a hard look at the environmental

7    consequences of their actions."  *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1070 (9th

8    Cir. 2002); *see Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ("[I]t is now

9    well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary

10   process.").  It was enacted with two goals mind: "(1) to ensure the agency will have detailed

11   information on significant environmental impacts when it makes its decisions; and (2) to guarantee

12   that this information will be available to a larger audience."  *Inland Empire Public Lands Council v.*

13   *U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996).  These goals are satisfied once the agency

14   completes its evaluation; the statute therefore "exists to ensure a *process*, not to ensure any result."

15   *Id.* at 758 (emphasis in original); *see Metcalf*, 214 F.3d at 1141 (9th Cir. 2000) ("NEPA does not set

16   out substantive environmental standards, but instead establishes 'action-forcing' procedures that

17   require agencies to take a 'hard look' at environmental consequences.").  Among other

18   requirements, the agency must prepare an Environmental Impact Statement ("EIS") for all actions

19   which significantly affect the quality of the human environment.  *See* 42 U.S.C. § 4332(2)(C).[6]  An

20   EIS must include a comprehensive discussion of all substantial environmental impacts and inform

21   the public of any reasonable alternatives which could avoid or minimize these adverse impacts.  *See*

22   40 C.F.R. § 1502.1.  In assessing the adequacy of an agency's EIS, courts apply the "rule of reason"

23

24   [4] Because the NPS violated the Wilderness Act by foregoing the requisite specialized finding, the
     Court need not address the dispute over whether the ongoing commercial stock use currently
25   permitted in SEKI's wilderness is unnecessary under the Act.
     [5] Both parties agree that further briefing is necessary for the purpose of determining an appropriate
26   remedy.  The NPS asserts that the proper remedy is to remand the matter to the agency, not to vacate
     the GMP in its entirety, because plaintiff is only challenging the GMP with respect to stock use, a
27   small component of the large programmatic document.  The HSHA, while stipulating to a future
     briefing schedule to address remedy, insists that injunctive relief is necessary.
28   [6] Before issuing an EIS, an agency may choose to prepare an Environmental Assessment ("EA") to
     determine whether the environmental impact of a project is significant enough to warrant an EIS.
     Under this process, only if the EA concludes that an EIS is necessary, must the agency prepare one.
     40 C.F.R. § 1508.9.

1  standard which determines whether the EIS contains a "reasonably thorough discussion" of the

2  "probable environmental consequences." *Cal v. Block*, 690 F.2d 753, 761 (9th Cir. 1982); *Friends*

3  *of Yosemite Valley v. Norton*, 348 F.3d 789, 801 (9th Cir. 2003) (equating the "rule of reason"

4  standard to an abuse of discretion review).

5        Here, the NPA prepared an EIS accompanying the GMP.  Regardless, the HSHA asserts that

6  the NPA violated NEPA by: (1) failing to consider a range of reasonable alternatives before issuing

7  Packer Permits or approving the GMP; (2) neglecting to take the required hard look at the

8  environmental impacts of the levels of stock use permitted under the GMP; and (3) improperly

9  relying on outdated environmental assessments and categorical exclusions in issuing Packer

10  Permits.

11        As a threshold matter, the parties dispute whether the EIS should be considered

12  programmatic or site-specific.  This distinction is significant because courts assess NEPA

13  compliance differently depending on the type of EIS at issue.  A programmatic EIS need only

14  provide "sufficient detail to foster informed decision making," while a site-specific EIS must

15  include "data-gathering and analysis of system-wide impacts."  *'Ilio'ulaokalani Coalition v.*

16  *Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006); *see also Block*, 690 F.2d at 761 (explaining that

17  considerations regarding the adequacy of a programmatic EIS may differ from those for a site-

18  specific EIS).  Under certain circumstances, programmatic EIS are encouraged to promote

19  efficiency and to "eliminate repetitive discussions of the same issues and to focus on the actual

20  issues ripe for decision at each level of the environmental review."  40 C.F.R. § 1502.20; *Friends of*

21  *Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003) (recognizing that programmatic EIS permit

22  agencies to "defer detailed analysis until a concrete development proposal crystallizes").  When

23  utilizing the programmatic approach, agencies must engage in a "tiered" process; the agency will

24  first issue the programmatic EIS and then follow up with one or more site-specific EIS as necessary

25  to assess adequately all environmental consequences.  *'Ilio'ulaokalani Coalition*, 464 F.3d at 1094;

26  *see* 40 C.F.R. § 1502.20; *Block*, 690 F.2d at 761 ("[T]he crucial inquiry in considering the adequacy

27  of [a programmatic] EIS . . . is not whether the project's site-specific impact should be evaluated in

28  detail, but when such detailed evaluation should occur.").  Such a tiered process is only appropriate,

however, when the EIS at issue is not evaluating an agency's "critical decision" with regards to site

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

11

*United States District Court*
For the Northern District of California

1   development.  *Block,* 690 F.2d at 761("When a programmatic EIS has already been prepared, we

2   have held that site-specific impacts need not be fully evaluated until a 'critical decision' has been

3   made to act.").  A "critical decision" is defined as one that "constitutes an irreversible and

4   irretrievable commitment of the availability of resources" to a project at a specific site.  *Norton*, 348

5   F.3d at 801 (quoting *Block*, 690 F.2d at 761).  Thus, the crucial inquiry in determining whether the

6   EIS should be evaluated as one of a programmatic or site-specific nature is whether the GMP makes

7   an irretrievable commitment of resources that affects stock use.

8          The HSHA contends that the EIS should be regarded as site-specific, not programmatic.  The

9   Association argues, contrary to the NPS's assertions, that the GMP is more than a guiding

10  document, but rather, an implementation plan which provides critical and binding decisions as to

11  "grazing, monitoring, and capacity-related issues for stock."  Such critical decisions are reflected

12  where the GMP: (1) allows stock use at preexisting levels and; (2) constrains future agency choices

13  which cause the expansion of stock use.  In short, the HSHA argues that, due to these critical

14  decisions, the NPS is not permitted to characterize its EIS as programmatic in an effort to avoid the

15  detailed analysis required by NEPA.  In response, the NPS discusses the HSHA's characterization

16  of the GMP and insists there are no critical decisions made in that planning document.  The NPS

17  notes that its determination in the ROD and GMP to continue stock use up to current levels and

18  under current policies flows from its earlier decisions made in the SUMMP and BMP.  Additionally,

19  the GMP does nothing to constrain the NPS's future choices with regards to the implementation of

20  stock use projects. Consequently, the NPS asserts, the GMP should be treated as programmatic and

21  the accompanying EIS need not meet the requirements of a site-specific evaluation.

22         Determining an answer to that dispute "begins with an accurate description of the NPS's

23  proposed action."  *Norton*, 348 F.3d at 801.  Here, the ROD, implementing the GMP, explains that

24  the latter simply "provides conceptual guidance for park managers . . . that the parks may wish to

25  consider at some point in the future."  (GMP 0021661).  As to stock use, it specifically advises

26  SEKI to maintain current levels according to the previous policies of SUMMP and BMP.  With

27  regard to future stock use, neither the ROD nor the GMP makes any binding decisions.  Rather, the

28  ROD anticipates the development of a Wilderness Stewardship and Stock Use Plan ("WSSUP") to

make critical determinations regarding stock use.  The WSSUP will "be developed—with formal

opportunities for review and comment as well as informal public meetings—to regulate use and protect wilderness areas." (GMP 0021661).[7]  It will also be accompanied by its own site-specific EA or EIS pursuant to a regulatory tiered approach.  Notably, nothing in the ROD appears to limit the NPS in future decisions.  Rather, the ROD provides for the precise sort of multi-stepped approach permitted by the regulations.  To this point, the ROD states that the "GMP does not address site specific design and location attributes for [stock support] facilities," thereby inferring that these issues will be addressed in upcoming site-specific EIS.

In *Norton*, the Ninth Circuit similarly considered whether a programmatic EIS was permitted, evaluating if the NPS's proposed action constituted a critical decision for purposes of NEPA.  In determining that no critical decision had yet been made, the Court emphasized that the Comprehensive Management Plan ("CMP") itself provided that it was a guiding document.  Furthermore, the Court held that "because a subsequent and full environmental review is contemplated . . . neither function constitutes 'an irreversible and irretrievable commitment of the availability of resources.'"  348 F.3d at 801.

Analogously here, the NPS's own assertions and the ROD language support that no irretrievable commitment has been made with respect to stock use.  The mere continuing issuance of Packer Permits according to prior policies under the GMP, does not constitute a renewed irretrievable commitment.  *See, e.g. Center for Environ. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000 (9th Cir. 2011) (stating that issuing permits did not constitute an irretrievable commitment of resources).   Rather, the NPS has promulgated a programmatic plan for its parks with an accompanying programmatic EIS.  When critical decisions with regard to site-specific acts are made in the future, the NPS must then prepare more detailed EIS.  For purposes of this NEPA challenge, the EIS will consequently be analyzed pursuant to the requirements of a programmatic EIS.  *See Block*, 690 F.2d at 761 ("The standards normally applied to assess an EIS require further refinement when a largely programmatic EIS is reviewed.").

        1.   The NPS's Consideration of Reasonable Alternatives

---

[7] At oral argument, plaintiff focused on the inadequacies of the forthcoming WSP, stating the plan's Notice of Intent restricted its implementation only to the 96.8% of SEKI designated as wilderness areas.  Importantly, this scoping document is merely an initial draft and the NPS is fully in its discretion to expand the final WSP to address all areas of the park.  Plaintiff, however, may request within the upcoming briefing on remedy, a court order regulating the scope of the WSP.

**United States District Court**
For the Northern District of California

1   The HSHA's first NEPA challenge concerns the NPS's alleged failure to consider a proper

2   range of alternatives.  Specifically, the HSHA argues that the NPS should have analyzed both the

3   "no grazing" alternative and the alternative which would have completely banned stock usage at

4   higher elevations, before issuing the GMP.  In response, the NPS contends it has not violated

5   NEPA, that while it did not consider the two alternatives raised by the HSHA, both will be

6   examined during the WSP process.  Furthermore, the NPS asserts that the ROD and the GMP

7   analyzed five reasonable alternatives, thereby, providing the public and the decision-makers with a

8   range of different approaches to stock use.  This range, the NPS insists, is more than sufficient given

9   the policy goals and programmatic nature of the GMP.

10   NEPA requires agencies "to inform decisionmakers and the public of the reasonable

11   alternatives which would avoid or minimize adverse impacts or enhance the quality of the human

12   environment."  40 C.F.R. § 1502.1.  "Judicial review of the range of alternatives considered by an

13   agency is governed by a 'rule of reason' that requires an agency to set forth only those alternatives

14   necessary to permit a 'reasoned choice.'"  *Block*, 690 F.2d at 767 (quoting *Save Lake Washington v.*

15   *Frank*, 641 F.2d 1330, 1334 (9th Cir. 1981)); *see also 'Ilio'ulaokalani Coalition*, 464 F.3d at 1094,

16   ("The scope of reasonable alternatives that an agency must consider is shaped by the purpose and

17   need statement articulated by that agency.").  Substantial deference, therefore, is given to the

18   agency's articulated purpose and objectives for the planned project.  *'Ilio'ulaokalani Coalition*, 464

19   F.3d at 1095.  The crucial inquiry for courts applying the rule of reason "is whether an EIS's

20   selection and discussion of alternatives fosters informed decision-making and informed public

21   participation."  *Block*, 690 F.2d at 767.  It follows that there is no requirement under NEPA that an

22   agency consider every possible alternative to a proposed action.  *See Westlands Water Dist. v. U.S.*

23   *Dept. of Interior*, 376 F.3d 853, 871 (9th Cir. 2004) (reversing the district court's holding that the

24   range of alternatives considered was unreasonable because the agency reviewed sufficient

25   alternatives to meet the goals of NEPA to provide for an "open, thorough public discussion").

26   Rather, an agency need only analyze alternatives which do not appear to be "too remote or

27   speculative" to accomplish the project's purpose.  *Block*, 690 F.2d at 767; *see City of Angoon v.*

28   *Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986) ("When the purpose (of a project) is to accomplish one

thing, it makes no sense to consider the alternative ways by which another thing might be

United States District Court

For the Northern District of California

1    achieved."). An agency, however, must, at least, "briefly discuss the reasons" for eliminating any

2    alternative. 40 C.F.R. § 1502.14.

3            As stated above, courts must defer to the agency's proffered statement of purpose in

4    assessing whether the NEPA document sufficiently considered all reasonable alternatives. Federal

5    courts in the Ninth Circuit embrace this deference wholeheartedly and consistently refuse to

6    determine that an agency's articulated purpose is too narrow. *Kettle Range Conservation Group v.*

7    *U.S. Forest Serv.*, 148 F. Supp. 2d 1107 (E.D. Wash 2001) ("This court is not aware of any case in

8    which the Ninth Circuit found a statement of purpose to be unreasonably narrow."); *see*

9    *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 812-13 (9th Cir. 1999)

10   (adopting the agency's narrow purpose even though it essentially ruled out any alternatives which

11   did not resemble the preexisting plan); *Friends of Se's. Future v. Morrison*, 153 F.3d 1059, 1066-67

12   (9th Cir. 1998) (upholding a narrow purpose which excluded consideration of any alternative which

13   would provide less timber to the market). Here, the NPS presents as the GMP's stated objective,

14   "set[ting] forth the basic management philosophy for the parks and provid[ing] strategies for

15   addressing issues and achieving management objectives" so as to develop a "conceptual framework

16   for formulating the[] alternatives" presented. (GMP 00001-00002). As evidenced by this language,

17   the purpose of the GMP was not to provide a detailed assessment of management options for stock

18   use in the parks; such a detailed assessment will be a part of future WSPs. The alternatives

19   considered, therefore, need only be appropriate for this stated purpose, not for the anticipated WSP

20   to come.

21           Notably, this conclusion fits with the purpose of NEPA's "reasonable alternative"

22   requirement of ensuring that the "most intelligent, optimally beneficial decision will ultimately be

23   made." *N. Alaska Environ. Center v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (quoting

24   *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109,

25   1114 (D.C. Cir. 1971)); *Westlands Water Dist. v. United States Dept. of the Interior*, 376 F.3d 853,

26   871 (9th Cir. 2004) (requiring only that the EIS's considered alternatives fulfill NEPA's purpose of

27   providing an "open, thorough discussion promoting informed decision-making"). This is because, if

28   the NPS is not using the GMP to make any *new* decisions that alter current or future stock use, it is

     premature to insist that the GMP should consider detailed alternatives to these unmade decisions—

1   they will be evaluated in the upcoming WSPs.  Furthermore, the agency did, in fact, assess five

2   alternatives in the GMP, ranging from a no-stock approach to a number of options suggesting that

3   stock use be monitored to prevent resources impairment.[8]  The NPS's consideration of five

4   alternatives, with the expectation that it will assess more in the future, is sufficient to demonstrate

5   NEPA compliance at this time.  *See, e.g.*, *Kempthorne* , 457 F.3d at 978 (rejecting plaintiffs'

6   argument that the EIS which considered five alternatives was insufficient); *Westlands Water Dist.*,

7   376 F.3d at 871 ("The EIS was not required to consider more mid-range alternatives to comply with

8   NEPA.").

9              2.   NPS's Consideration of Environmental Impacts[9]

10        NEPA requires that an agency take a "hard look" at mitigation measures which may offset

11  any adverse environmental consequences of an agency's proposed action.  *See* 40 C.F.R. § 1502.16.

12  The agency must utilize the EIS to discuss such mitigation measures "in sufficient detail to ensure

13  there has been a fair evaluation" of the consequences.  *Robertson v. Methow Valley Citizens*

14  *Council*, 490 U.S. 332, 352 (1989).  An agency's compliance with this NEPA requirement is also

15  analyzed under the "rule of reason" standard.  *Block*, 690 F.2d at 761 (quoting *Trout Unlimited, Inc.*

16  *v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)).  This standard of review "inquires whether an EIS

17  contains a 'reasonably thorough discussion of the significant aspects of the probable environmental

18  consequences.'"  *Id.*  The level of detail required in each EIS depends on the objectives and scope of

19  the proposed action.  *Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency*

20  *Procedures*, 422 U.S. 289, 322 (1975).  Thus, the Ninth Circuit has determined that the distinction

21  between inadequate and adequate impact and mitigation discussions "appears to be one of degree."

22  *Compare Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000) (holding that

23  the Forest Service complied with NEPA's "hard look" requirements even though the agency

24  described the mitigating measures in general terms) *with Neighbors of Cuddy Mountain v. U.S.*

25

26  [8] The HSHA's argument that three of these options will raise stock levels is purely speculative as
27  the critical decisions with regards to stock use will be made within the forthcoming WSPs.
    [9] The parties consolidate the discussion of the adequacy of the EIS as it pertains to both the
28  evaluation of environmental impacts and the consideration of mitigating measures despite the fact
    that these components are often analyzed separately.  Following the parties' approach, the Court
    similarly combines the analyses.  This combination is appropriate as the controlling law for these
    issues largely overlaps.

United States District Court
For the Northern District of California

1  *Forest Service*, 137 F.3d 1372, 1381 (determining that an EIS did not fully consider all necessary

2  mitigating measures which could ameliorate consequences stemming from timber sales).

3      Although the standard for evaluating the requisite "hard look" scope is fact-specific, the

4  Ninth Circuit has established some bright-line rules.  Most importantly, the EIS must provide easily-

5  accessible detailed information about probable environmental consequences and potential mitigation

6  measures.  *Block*, 690 F.2d at 761.  This information must be conveyed within the EIS in plain

7  language so that the general public can "readily understand" the effects of the proposed plan.  40

8  C.F.R. § 1502.8.  Relatedly, the EIS cannot merely assert a perfunctory description of mitigating

9  measures.  *Neighbors of Cuddy Mountain*, 137 F.3d at 1380.  "A mere listing of mitigation measures

10  is insufficient to qualify as the reasoned discussion required by NEPA."  *Id.* (quoting *Northwest*

11  *Indian Cemetery Protective Ass'n v. Peterson*, 795 F.2d 688, 697 (9th Cir. 1986)).  Rather,

12  mitigation must be detailed with enough specificity to "ensure that environmental consequences

13  have been fairly evaluated."  *Carmel-By-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1154 (9th

14  Cir. 1997).

15      This specificity is required even when an agency is merely writing a programmatic EIS in

16  which "the precise contours of the proposed action ha[s] not yet been determined."  *League to Save*

17  *Lake Tahoe v. Tahoe Regional Planning Agency*, 739 F. Supp. 2d 1260, 1283 (E.D. Cal. 2010)

18  (citing *N. Alaska Envtl. v. Kempthorne*, 457 F.3d 966 (9th Cir. 2006), in which the Court determined

19  that even though the agency's plan was not yet site-specific, the mitigation analysis necessarily

20  included a range of mitigating measures and their respective effectiveness)).  An agency cannot,

21  therefore, avoid a detailed mitigation analysis simply by postponing it on the basis that the

22  "[f]easibility and success of mitigation would depend on site specific conditions."  *S. Fork Band*

23  *Council of W. Shoshone of Nevada v. United States Dep't of Interior*, 588 F.3d 718 (9th Cir. 2009)

24  (concluding that the EIS did not sufficiently address the mitigation measures related to groundwater

25  removal).  Importantly, however, although at the programmatic stage an EIS must provide sufficient

26  detail "to foster informed decision-making [,]. . . site-specific impacts need not be fully evaluated"

27  until the agency decides to undertake a site-specific project.  *Norton*, 348 F.3d at 800.

28      Finally, the Ninth Circuit has determined that, even though an agency need not actually

mitigate the identified harms, it must perform some assessment of whether the mitigation measures

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

17

**United States District Court**
For the Northern District of California

would be effective.  *Id.* at 727 ("An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective.").  This assessment must include "an estimate of how effective mitigation measures would be if adopted" or a "reasoned explanation as to why such an estimate is not possible."  *Neighbors of Cuddy Mountain*, 137 F.3d at 1381.  It must also provide supporting analytical data discussing the effectiveness of the relevant mitigation measure.  *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2007).

Here, the HSHA claims that the NPS violated NEPA by continuing to allow stock use at current levels and by issuing Packer Permits, without taking the necessary hard look at the environmental impacts of stock use.  Specifically, it asserts that the NPS neglected to assess: (1) the inadequacies of SEKI's own mitigation measures; (2) stock contamination of water resources; (3) harm to native animal populations caused by stock use; (4) the introduction of invasive non-native weeds via stock grazing; and (5) the aesthetic impact of stock.  In response, the NPS asserts there is no statutory or Ninth Circuit requirement to provide such detailed assessment. Rather, it insists that such site-specific detailed analysis of impact and mitigation measures will be addressed in the upcoming WSP as required in a properly tiered NEPA process.

a.   The EIS's Discussion of SEKI's Mitigation Measures

The HSHA contends the NPS failed to assess the inadequacies of SEKI's mitigation measures.  Specifically, the HSHA asserts that instead of conducting the requisite hard look analysis, the NPS merely listed potential mitigation measures, focusing in detail on two measures only: the temporary meadow closure program under the SUMMP and BMP and the Residual Biomass Monitoring Program ("RBM").  Even with regard to these more detailed measures, the HSHA insists that the NPS's analysis is lacking; the agency neglected to take a hard look at how both the temporary closure program and the RBM fail effectively to offset the adverse impacts of stock use.  The HSHA explains how both measures are ineffective.  It first maintains that the temporary meadow closure program is an *ad hoc* approach providing a remedy only after damage has occurred.  As a consequence, the NPS has never been forced to create a proactive system for closing meadows at the point when the threshold for stock use is reached.  The agency has therefore not implemented a permanent closure since 1986.  As an example, the HSHA refers to the McClure

1   Meadow which is still open for stock despite multiple recommendations from rangers that the area

2   should be closed to grazing animals.

3        The HSHA also addresses the inadequacies of the RBM.  This program operates by

4   comparing the amount of above-ground plant material in ungrazed areas with that in grazed areas.  It

5   is flawed, according to the HSHA, because it is subject to observer bias: the rangers collect data

6   through sight rather than through scientific analysis, SEKI staff are often unable to find a reference

7   plot that is wholly ungrazed, and the program does not consider either aesthetic or mechanical

8   impacts.  The HSHA concludes that the NPS has overlooked the programs' flaws and thereby

9   neglected its duty to take a hard look at potentially more effective mitigating measures.

10        The NPS maintains that the level of detail required with regard to mitigating measures must

11   reflect the programmatic document at issue; the GMP's discussion of mitigation is more than

12   sufficient.  Additionally, the NPS explains that neither the temporary closure program nor the RBM

13   should be labeled inadequate.  As to the temporary meadow closure program, the NPS asserts that

14   the document on which the HSHA relies for the proposition that a more proactive program for

15   meadow closure is needed, predated the GMP by eleven years.  Within that period, according to the

16   NPS, SEKI has developed and implemented an adaptive and effective program for meadow

17   management.  This program includes measures such as: (1) Management Directive ("MD") 9,

18   adopted in 2003, which authorizes rangers to recommend timelines for opening and closing

19   meadows for grazing in order to provide for resource protection; (2) a letter from the SEKI

20   Superintendent outlining how best to implement SUMMP and BMP in order to provide an effective

21   method for protecting meadows; and (3) efforts by the Meadow Management Committee to meet

22   annually to analyze monitoring results, stock use reports, and staff directives in order to prevent

23   meadow harm before it occurs.  The NPS insists these measures together sufficiently protect the

24   meadows.  The HSHA is incorrect, therefore, in asserting that the temporary meadow closure

25   program provides relief only after damage occurs; rather, it appears to work in conjunction with

26   these other programs to prevent meadow damage.

27        As to the RMB program, the NPS maintains plaintiff's objections are similarly unfounded.

28   It first asserts that the residual biomass estimation used by the program is a scientifically valid

indicator of meadow status "which warrants the greatest degree of judicial deference."  (*Id.* at 16)

United States District Court
For the Northern District of California

1   (citing *Lands Council v. McNair*, 537 F.3d 981, 1000 (9th Cir. 2008)).  It additionally states that the

2   RBM has been evaluated by the NPS-commissioned *Abbott* report which concluded that the

3   program produces "long-term databases capable of providing management with information that is

4   robust with respect to short-term fluctuations.  Thus we recommend that the biomass monitoring be

5   continued, with refinements."  (GMP 0037548).  From this language, the NPS concludes it justly

6   determined to utilize biomass monitoring until a more detailed analysis is conducted in the WSSUP.

7   Based on these assessments of the two mitigation measures, the NPS concludes that, for a

8   programmatic plan, the EIS at issue is more than sufficient.[10]

9           As the NPS accurately asserts, the level of detail required in a hard look analysis reflects the

10  scope of the EIS at issue.  The EIS and ROD repeatedly state that the purpose of the GMP is simply

11  to "provide management direction" and a "vision" for what SEKI should become in the future.

12  (GMP 0020243).  The details of this vision are to be ironed out in subsequent WSPs as permitted

13  under the tiered NEPA method.  The EIS clearly explains this tiered strategy to the public

14  throughout the document and more specifically in the section discussing mitigation measures.  For

15  example, in response to a comment expressing concern as to a lack of such measures, the GMP

16  urges "[i]t is beyond the scope of this general management plan to analyze all the details of stock (or

17  hiker) use.  A detailed analysis of stock and other wilderness activities will be conducted for the

18  future" WSSUP.  (GMP 0020928).

19  _____

20  [10] The HSHA contends that even under programmatic plan standards, the GMP does not contain a
sufficient discussion of environmental impacts or potential mitigation measures.  Plaintiff
21  emphasizes that the purpose of an EIS is to use plain language to inform the public of the agency's
action.  Thus, the NPS cannot just point to the entire administrative record and require both the
22  public and the Court to "hunt through nearly 52,000 pages of administrative record for evidence that
NPS took a hard look."  (Pl's. Repl. to Cross-Mot. for Summ. J. at 17).  To this effect, the HSHA
23  states that the GMP does not even mention MD 9, one of the measures cited by the NPS in its
briefings; to expect the public to search for MD 9 in an effort to uncover sufficient mitigating
24  measures defeats the purpose of the EIS.  The HSHA is correct that an agency cannot fulfill NEPA's
hard look requirement by presenting a discussion which is "so diffuse, scattered, or opaque that a
25  court must play Humpty Dumpty to put the [administrative] pieces together in a coherent fashion."
*Center for Environ. Law & Policy*, 655 F.3d at 1009.  An agency also fails to comply with NEPA by
26  merely listing mitigation measures, without further discussion.  *See Neighbors of Cuddy Mtn.*, 137
F.3d at 1380.  Contrary to the HSHA's assertions, however, the NPS has done neither of these
27  things.  Rather, it simply postpones more detailed discussions until the WSSUP is complete.  While
the NPS mitigation discussion and reliance on the administrative record would be deficient if the
28  EIS was site-specific, it meets the threshold for a programmatic EIS.

**United States District Court**
For the Northern District of California

The EIS also includes a generalized discussion of the mitigation measures as is appropriate for a programmatic EIS.  It mentions a number of continuing efforts such as "controlling access based on soil moisture conditions, restricting use numbers, timing use and closing meadows to grazing, improving trails . . . requesting weed-free feed, and continuing ongoing educational efforts."  While, as the HSHA contends, this list appears to violate *Neighbors of Cuddy Mountain* by merely mentioning mitigation measures without further explanation, the HSHA, in making this contention, seemingly neglects to consider the mitigation discussion located in both the description of the alternatives and the explanation of environmental impacts.  Such a bifurcated discussion of mitigation measures is permitted within a programmatic EIS.  40 C.F.R. §§ 1502.14(g) & 1502.16(h); *see generally Center for Environ. Law & Policy*, 655 F.3d at 1009 (emphasizing that "it would impermissibly elevate form over substance" to require the NEPA document to repeat its cumulative effects analysis under a particular heading when it was adequately considered throughout the extensive record).

Furthermore, subsequent to this generalized discussion of a number of mitigation measures, the EIS describes the residual biomass process and how it works in conjunction with other plans.  Applying the rule of reason standard, the Court therefore cannot conclude that the NPS failed adequately to take a hard look at the mitigation measures necessary for a programmatic guiding document.  At the time the GMP was prepared, MD 9, MD 38, and a number of other science-based management techniques were in effect to assess the levels of current stock use.  The fact that the GMP did not implement any new stock use or alter the policy for issuing permits, means that a study of mitigating measures for an increase in stock use is not yet necessary.  These measures, however, must be closely analyzed in a properly tailored study within the WSSUP.  *See Norton*, 348 F.3d at 802 (permitting a broad programmatic EIS, but insisting that the NPS must "prepare appropriate environmental review" for all "future actions" guided by the programmatic NEPA document).

### b.  The EIS's Discussion of Water Resource Impacts

The HSHA next contends that the NPS failed to take the required hard look at impacts resulting from the discharge of stock manure and urine.  Instead, the HSHA maintains, the EIS ignores the scientific reports indicating a relationship between stock use and water contamination.  Plaintiff specifically refers to a number of studies by Dr. Robert Derlet which allegedly demonstrate

the correlation between fecal matter in the water and grazing.  The NPS counters that the HSHA is mistaken in asserting that the agency failed to discuss mitigating measures for the impacts of stock use on water resources.  First, the NPS contends that in preparing the GMP it relied on a prior SEKI plan specifically addressing water, the Aquatic/Water Resources Management Plan.  According to the NPS, this plan provides "the parks' water resources information database and specific objectives for managing aquatic and water resources."  (Defs'. Cross-Mot. for Summ. J. at 17).  The NPS issued the GMP knowing that these regulations were already in place.  Furthermore, the NPS insists that it did consider the Derlet reports in preparing the GMP.  For support, defendants refer to the EIS which discusses the 2004 study by Dr. Robert Derlet and Dr. James Carlson.  (GMP 0020929).  The EIS explains that this study "failed to show any detectable correlation between increased water-borne pathogens and high-use stock areas."  (*Id.*).  The EIS further insists that although there have been complaints of stock discharge into streams, the "water quality is excellent when compared to the standards in the *Water Quality Control Plan* for the Central Valley Regional Water Quality Control Board."  *Id.*  Despite this EIS discussion, the HSHA contends that the NPS did not sufficiently consider all the Derlet studies—it only cited the 2004 study in the referenced portion.  It neglected, therefore, to incorporate Dr. Derlet's 2006 study into the GMP which confirmed the correlation between grazing and water contamination.

NEPA does not require courts to "decide whether an [EIS] is based on the best scientific methodology available."  *McNair*, 537 F.3d at 1003 (quoting *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985)).  Nor does it insist that courts resolve disagreements between scientists as to methodology or outcome.  *See Jantzen*, 760 F.2d at 986.  Rather, the rule of reason standard simply involves ensuring that the agency followed a procedure which "resulted in a reasoned analysis of the evidence before it," regardless of the outcome.  *Id.*; *see* 5 U.S.C. § 706(2)(D); *Lanthan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974) (emphasizing that NEPA is a procedural statute and that the adequacy of an EIS depends on whether it was prepared in observance of proper procedures).  Here, the NPS demonstrates that it considered at least the 1989 SEKI Water Resources Management Plan, the 2005 Water Resources Information and Issues Overview Report, and the 2004 Derlet study in concluding that: (1) there are some reports of water contamination, but water quality is excellent compared to the Central Valley standards; and (2) the

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  2004 study failed to establish a correlation between stock use and water contamination.  These

2  conclusions, in addition to the agency's promise to conduct a detailed water analysis in the WSP,

3  satisfy NEPA.[11]

4           c.   The EIS's Discussion of Native Animal Populations

5        The HSHA insists that the NPS also did not take the requisite hard look at damage to native

6  populations.  Specifically, it maintains that the EIS neglected to assess the impacts and potential

7  mitigating measures with regard to the bighorn sheep, the mountain yellow-legged frog ("MYLF"),

8  and the Yosemite toad.  According to plaintiff, evidence of this neglect is demonstrated by the U.S.

9  Fish & Wildlife Service's ("USFWS") determination that the Draft GMP did not provide sufficient

10  information regarding the potential impact on certain endangered species.  The NPS does not

11  dispute that the USFWS was "unable to concur" with a number of the NPS's conclusions about

12  endangered species.  (GMP 0021692).  The NPS does however remark that the USFWS opinion is

13  of little importance to the determination of whether there is a NEPA violation because the USFWS

14  was commenting as to the Draft GMP.  As a result of this comment, the NPS engaged in discussions

15  with the USFWS on November 5, 2004, which "resulted in an agreement that the NPS will complete

16  site-specific data collection at the project level to determine" if the project specific actions would

17  violate the Endangered Species Act.  (GMP 0020915).  To this effect, the NPS states that such a

18  tiered consultation approach is appropriate under the Act.

19        As to the specific species mentioned by the HSHA, the NPS further insists that it adequately

20  considered all impacts and mitigation measures for purposes of a programmatic document.  The EIS

21  determined that the Preferred Alternative was not likely to result in adverse effects to the Sierra

22  Nevada bighorn sheep.  There was consequently no need to consider a full scale mitigation plan.

23  The NPS arrived at this conclusion after the NPS wildlife biologist determined that the primary

24  threat to bighorn sheep was not the preferred alternative, but rather, predators, production of less-fit

25  lambs, domestic sheep presence, and a number of natural occurrences.  The agency, in so

26  concluding, also considered the fact that recent monitoring reflected expanding sheep population

27
28

---

[11] The mere fact that the HSHA can present a 2006 study by Dr. Derlet is insufficient to establish that the NPS failed to take the requisite hard look at water contamination.  This is especially the case because the two parties interpret the study differently.  The HSHA maintains that Dr. Derlet found a correlation between water contamination and stock grazing while the NPS asserts that the study only notes areas of stock use are at risk of contamination.

1  within SEKI.  No need, therefore, arose for immediate mitigation measures.  Rather, the NPS would

2  work with USFWS on future WSPs and instruct park managers to take precautions as necessary.

3      The HSHA contends that this analysis is insufficient because the decision in *Sierra Hikers*

4  *Ass'n v. Kennedy*, No. C–94–3570 CW, 1995 WL 382369, at *15 (N.D. Cal. June 14, 1995),

5  informed the agency that bighorn sheep are displaced when stock approach sheep forage sites and

6  this displacement can lead to loss of essential nutrients.  Plaintiff, however, cannot expect the NPS

7  to rely on the *Kennedy* decision for purposes of its hard look analysis because the decision has been

8  vacated.  Instead, the Court must defer to the NPS's determination that the bighorn sheep will not

9  likely be adversely affected by the EIS, particularly as the NPS represents it considered a number of

10  other sources in reaching its conclusion.  *See Jantzen*, 760 F.2d at 986 (emphasizing that it was not

11  for the Court to assess an agency's scientific methodology or to determine which expert opinion is

12  accurate).

13      The NPS further asserts that it sufficiently considered the impacts on the MYLF and the

14  Yosemite toad.  After considering all the information available, the EIS determined that the

15  Preferred Alternative would not likely have an adverse effect on either amphibian.  As to the MYLF,

16  the NPS examined the 2005 Water Resources Information and Issues Overview Report which

17  emphasized that the suspected primary cause of the species' decline was the introduction of trout

18  and airborne contaminants.  The NPS also considered the existing stock use restriction at Sixty

19  Lakes Basin, the location of one of the park's largest remaining MYLF populations.  As to the toad,

20  the NPS similarly scrutinized the 2005 Report which summarized various studies and concluded that

21  a number of factors contribute to the species' decline; while these factors include grazing, the

22  Report mainly emphasized the threat posed by trout.  To this point, the Report explained that the

23  NPS is developing long-term monitoring plans for amphibians which include wide-range surveys to

24  assess how best to preserve the species.[12]  Based on these scientific studies and the decision to

25

26

27  [12] The HSHA points to a decision from this district that the Forest Service failed to provide
sufficient detail with regards to mitigation measures to protect the Yosemite toad.  *HSHA v.*

28  *Weingardt*, 521 F. Supp. 2d 1065, 1087 (N.D. Ca. 2007).  The HSHA maintains that in *Weingardt*,
the agency provided more detail than the EIS at issue here; thus, this EIS must also fail under NEPA
analysis.  The analysis in *Weingardt*, however, is not controlling because the EIS in *Weingardt* was
a site-specific document while the EIS here is a programmatic one.

**United States District Court**
For the Northern District of California

1    cooperate with the USFWS to assess further impacts in the WSP, the NPS determined that no

2    specific mitigation measures need be adopted at the programmatic GMP stage.

3          The HSHA argues the NPS was aware chytrid fungus destroys MYLF populations and that

4    hoofs can carry such fungus into the park, but neglected sufficiently to discuss such impacts in

5    either the EIS or the 2005 Report.  For support, the HSHA refers to two documents within the

6    record which mention the potential threat of the fungus on MYLF populations.  These documents,

7    however, are insufficient to overcome the NPS's assurances that it considered all impacts on

8    endangered species.  One of plaintiff's references is to a memo from a field ranger who, with no

9    scientific basis, concluded that chytrid fungus endangered MYLFs.  The other is to one line in the

10   extensive 2004 SEKI Natural Resources Annual Report which states that the Sierra Nevada Aquatic

11   Research Lab surveys "found continued decline of significant populations of mountain yellow-

12   legged frogs due to chytrid fungus."  (GMP 0039815).  This negligible showing is insufficient to

13   demonstrate that for purposes of a programmatic EIS, the NPS acted capriciously in determining

14   that no further mitigation measures were required at the time of the GMP.   Under the rule of reason

15   standard, the NPS took a hard look at the impacts on endangered species, identified the relevant

16   areas of concern, and reasonably decided that further site-specific analysis would be postponed to

17   the implementation stage.

18                      d.   The EIS's Discussion of Invasive Weeds

19         The HSHA next asserts that the EIS overlooks documents in the record which demonstrate

20   that stock introduces harmful non-native weeds into SEKI.  It thereby violated NEPA by neglecting

21   to assess environmental impacts or to consider potential mitigating measures such as no-grazing or

22   weed-free feed options.  For support, plaintiff refers to a 1996 study from the Center for Water and

23   Windland Resources which determined that improper grazing methods "exacerbate the spread of

24   invasive weeds."  (GMP 0031645).  Plaintiff also invokes the NPS's own annual warnings that

25   weeds may be transported by stock.  Finally, the HSHA mentions that the NPS's own restoration

26   ecologist commented that more studies on invasive plants were necessary if stock use continued at

27   current levels.  The HSHA contends the NPS ignored this research demonstrating the dangers of

28   stock use and weeds, and consequently failed to implement effective strategies.

United States District Court

For the Northern District of California

The NPS contests much of the HSHA's argument.  First, it insists that many of the documents plaintiff relies on are either outdated or irrelevant to NEPA analysis.  For example, exhibit 70 refers to "east-side sagebrush steppe rangelands," a condition not applicable to SEKI's ecosystems.[13]  Second, the NPS maintains the very fact that it issues annual warnings about weeds to stock users demonstrates it has taken steps to mitigate the damage and inform the public of the harms of weeds.[14]  Third, the NPS insists that it indeed has taken steps in response to the ecologist's recommendation invoked by the HSHA.  Since that time, the agency has begun conducting early detection surveys for non-native plants, trained wilderness rangers to recognize non-native plants, and implemented programs to detect and treat non-native plants at Cedar Grove Pack Station and trailheads frequented by stock animals.  Lastly, the NPS claims that the EIS does more than merely list potential mitigation measures without addressing their effectiveness; rather, the EIS considered the numerous SEKI plans in effect and determined that resulting use impacts stemming from the Preferred Alternative "would likely be negligible to minor."  (GMP 0020604).  This is because the increased use would be confined to areas which already receive high to moderate levels of use.  The NPS therefore determined that no new mitigating measures were immediately necessary to address such negligible impacts.[15]  The NPS further states that although it has not completed all possible mitigation measures with regard to invasive plants, NEPA does not require mitigation; it simply insists that agencies consider the impacts and inform the public of the harms associated with invasive weeds.

Admittedly, the EIS fails to include a thorough discussion of invasive weeds despite the documents in the record which attest to such dangers.  As the NPS points out, however, many of the documents identified are inapplicable in SEKI.  Furthermore, the NPS is currently engaged in a comprehensive plan to prevent an increase in the levels of non-native weeds; the agency fulfills its

---

[13] The HSHA does not contest the NPS's arguments with regards to the inapplicability of Exhibits 70, 71, or 72.

[14] The NPS also insists that the HSHA improperly and selectively quotes from SEKI's 1999 Natural and Cultural Resources Management Plan.  The NPS specifically objects to the truncated quotation provided in plaintiff's summary judgment motion stating that stock "provides a potential vector for the introduction of exotic plants."  (GMP 0030635).  Defendants maintain that this quote is taken out of context because the entire plan demonstrates that many stressors, not just stock, affect the levels of invasive weeds.

[15] With regard to low use front-country areas, the EIS suggests "removing invasive plants" as a management prescription to mitigate any impacts.  (GMP 0020321).

United States District Court

For the Northern District of California

1    burden of demonstrating the effectiveness of this plan throughout the paper discussing the Velvet

2    Grass in the Kern Canyon.  (CUA 002267-68).  With this plan in place, the NPS reasonably

3    concluded that the Preferred Alternative would have little to no new impact on vegetation.  Whether

4    this conclusion is correct is not for the Court to decide: "NEPA itself does not mandate particular

5    results, but simply prescribes the necessary process."  *Robertson*, 490 U.S. at 350.

6          As a further note, the HSHA places much emphasis on the fact that the EIS suggests a

7    potential mitigation measure of removing invasive species in front-country areas, insisting that such

8    a "listing" contravenes the Ninth Circuit's holding in *Neighbors of Cuddy Mountain*.  This,

9    however, is an inaccurate characterization of the EIS.  The GMP mentions the measure simply to

10   provide a management prescription to be considered in the WSP.  At the time the GMP was

11   prepared, the NPS had already determined that mitigation measures were unnecessary for invasive

12   weeds; the effects of stock use and invasive weeds were being addressed elsewhere and this EIS

13   would have "negligible" impact on these weeds.  Consequently, the mention of invasive weeds in

14   the EIS combined with the NPS's active program to educate the public and to combat the invasion

15   of non-native plants satisfies the agency's NEPA obligations.

16                       e.   The EIS's Discussion of Aesthetic Impacts

17         The HSHA asserts that the NPS failed to take a hard look at the impacts of stock use on

18   aesthetics and opportunities for spiritual refreshment.  It claims that the NPS was put on notice of

19   these impacts from a number of documents which span a period of twenty-five years: (1) a 1989

20   Chief Ranger memo requesting further consideration of stock effects on aesthetics; (2) an undated

21   letter from a park visitor who complained of the dust from stock animals; and (3) two letters

22   expressing displeasure with stock use in the park and describing the impacts of such use on the park

23   experience.  Despite these documents, the HSHA contends that the NPS made no attempt to

24   evaluate the impacts or adopt mitigation measures, thereby, rendering the procedural requirements

25   of NEPA meaningless.  The NPS recognizes that it received a number of letters objecting to stock

26   use and complaining of the aesthetic impact of animals in the park.  It explains, however, that the

27   Draft GMP also garnered numerous comments from visitors and organizations demanding increased

28   stock use and asserting that they could only appreciate the aesthetic beauty of the park if stock was

     permitted.  The NPS responded to all of these comments on both sides of the argument and took

them into account in preparing the EIS.  In crafting it, the agency also considered evidence

demonstrating: (1) that stock use had declined in the past five years; and (2) the existence of

ongoing attempts to facilitate communication and cooperation between backpackers and stock users.

After evaluating all of this evidence, the EIS concluded that the impact of stock use "would continue

to cause minor, adverse, long-term impacts to some backcountry hikers, but increased regulation and

stock-free areas which would be determined in the forthcoming wilderness stewardship and stock

use plan, would mitigate this impact."  (GMP 0020762).  In other words it determined that based on

the programmatic nature of the EIS and the fact that stock use would remain at current levels, there

was no need currently for further debate over aesthetic impacts.

The HSHA maintains that this determination was both arbitrary and capricious.  In fact, the

HSHA asserts that it has for years requested that the NPS create a system of foot only trails.  The

agency has repeatedly denied this request, closing to stock only two short trail segments which are

difficult to access, the Whitney and Sawtooth trails.  The HSHA's arguments, however, are

insufficient to demonstrate that the NPS should have taken a harder look.  First, the simple fact that

the HSHA disagrees with the merits of the NPS's conclusions of where to provide stock free trails is

immaterial to NEPA analysis.  *Robertson*, 490 U.S. at 351; *Sierra Club v. Kimbell*, 623 F.3d 549,

561 (8th Cir. 2010) ("Although Sierra Club may disagree with the merits of the Forest Service's

conclusion, the agency's discussion demonstrates that it made an informed decision, and NEPA

requires nothing more.").  Second, the HSHA's objections as to the two specific trails are

inappropriate for a programmatic EIS.  As defendants indicate, analysis as to access to individual

trails is more appropriate for the upcoming site-specific EIS.  Based on the record, the agency's

analysis is sufficient to demonstrate the type of NEPA compliance necessary for a programmatic

EIS and its conclusion is neither arbitrary nor capricious.

     5.   Issuance of Annual Packer Permits

The HSHA asserts that the NPS improperly relied on the SUMMP, BMP, GMP or

categorical exclusions to issue Packer Permits.  The HSHA explains the NPS initially represented

that further NEPA compliance was necessary before it would issue or renew Packer Permits.  This

representation was based on the agency's belief that more stringent environmental policies were

necessary to regulate stock permits and that the SUMMP and BMP were outdated.  Despite these

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

assurances, the NPS backtracked on this promise to stay the issuance of new permits in 2005, stating

that further "review and consultation demonstrated to us that the compliance conducted in the mid-

1980s [in the SUMMP and BMP], and their accompanying Environmental Assessments was

appropriate and is still valid."  (GMP 0021311).  According to the HSHA, this reversal was

improper because NPS cannot depend on EAs conducted over twenty years ago to meet its NEPA

obligations; rather it must take a hard look at the impact of Packer Permits now before issuing or

renewing any further Permits.  As per the NPS's own concession, this hard look will not be

completed until the upcoming WSP.  Furthermore, the HSHA argues that the NPS cannot rely in the

alternative, on categorical exclusions to issue the permits.  This is because the use of such

exclusions is limited solely to situations where there has been an insignificant or limited

environmental effect.  Packer Permits, insists the HSHA, undoubtedly have a significant effect.

The NPS asserts that is has fully complied with NEPA both in relying on the SUMMP, BMP

and GMP to issue permits, and in taking the additional step of providing environmental review

through the categorical exclusion process.  It insists that the 2009 CUAs and Contract Extension

were issued pursuant to: (1) the 2007 GMP which had an EIS level of review for purposes of

maintaining stock use at current levels; and (2) the SUMMP and BMP which were both

accompanied by EA level NEPA reviews.  These documents contain sufficient environmental

review regarding current stock levels to permit the agency to continue issuing permits, at these same

levels, until the completion of the upcoming WSP.

The HSHA bases much of its argument on the contention that both the SUMMP and BMP

are outdated and therefore cannot be relied upon for NEPA compliance.  In support, plaintiff refers

to documents in the record which note that the plans are either outdated or in need of revision.

Some of these documents were propounded by SEKI employees themselves.  For example, in 2001,

SEKI's Plant Ecologist, in an informal email, stated that the SUMMP was "overdue for revision."

(GMP 0016740).  Notably, however, within this same document the ecologist attached the SUMMP

for reference and explained that the plan "does a good job of lining up what we are doing where and

why." (GMP 0016739).  Additionally, contrary to the HSHA's assertions, the mere fact that some

staff and community members were concerned that the previous EAs were out-dated, does not

preclude the NPS from altering its position and deciding to retain stock use at current levels for the

United States District Court

For the Northern District of California

1   time being.  In fact, the NPS did comply with the proper procedures.  As to the SUMMP and BMP

2   the agency did backtrack, but only after determining based on "review and consultation" that the

3   EAs in both plans were fully NEPA compliant and "still valid."  (GMP 0021311).  In so

4   determining, the agency acknowledged its prior misstatements and concluded that pursuant to the

5   EAs of the SUMMP and BMP, it planned "on continuing to issue the permits in the same manner

6   until such time as we are able to conduct more extensive review and analysis of this activity during

7   the development and implementation of a Wilderness Stewardship Plan."[16]  (GMP 0021311).

8          Furthermore, as to the GMP, the NPS conducted a full EIS.  Based on this EIS, the NPS

9   concluded that until the WSP, stock use should not be increased but remain at current levels—

10  thereby permitting the issuance of Packer Permits at these levels.  The HSHA insists that the NPS

11  has repeatedly maintained the GMP is a programmatic document, lacking a detailed assessment as

12  to stock use and thus, by the NPS's own concession, cannot be relied on to issue Packer Permits.

13  The HSHA further insists that the NPS has "admitted that the GMP does not contain a detailed

14  environmental assessment of stock use," referring to a memo from the SEKI Superintendent.  (GMP

15  003268).  This memo, however, does not support the assertion the HSHA suggests.  Rather, the

16  memo simply states that while GMP would continue current stock use, the upcoming WSSUP

17  would more specifically "address grazing, monitoring and capacity-related issues for stock."  (CUA

18  0003268).  Notably, this memo also provides, with regards to Packer Permits, that the SUMMP and

19  BMP "have established a system of adaptive management standards based on monitoring and

20  analysis of field conditions . . . .  This system has proven to be effective in protecting resources."

21  (CUA 0003268).  Based on the administrative record, the HSHA is unable to demonstrate a

22  substantive basis for the conclusion that the EAs for the SUMMP and BMP are outdated.  The NPS,

23  therefore, did not violate NEPA in continuing to issue Packer Permits at current levels pursuant to

24  the environmental findings in the older plans and in the GMP.[17]

25  [16] The HSHA objects to the agency's conclusion, stating it could not possibly have determined that
    the prior EAs were sufficient after the requisite hard look; it must have therefore failed to comply
26  with the hard look requirement.  In support of this contention, the HSHA repeatedly invokes the
    vacated decision in *Kennedy*, 1995 WL 382369, which stated that "the SUMMP and the BMP
27  allowed unacceptable impacts to the parks' natural resources."  (Pl's. Mot. for Summ. J. at 23).  The
    HSHA cannot, however, rely on this vacated order even for factual background.
28  [17] As an alternative basis to justify the Packer Permits, the NPS maintains that it provided additional
    environmental review through a categorical exclusion.  As stated above, the HSHA maintains that
    such exclusions are inappropriate because the Packer Permits had significant effects on the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

## IV.  CONCLUSION

Plaintiff's motion for summary judgment is granted as to the Wilderness Act.  Defendants' cross-motion for summary judgment is granted as to the NEPA claim.  A Further Case Management Conference is set for March 1, 2012, at which the parties should be prepared to discuss scheduling further proceedings on the issue of remedy.

IT IS SO ORDERED.

Dated: 1/24/12

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

environment.  The NPS argues, however, that exclusions are permitted for actions which did not entail potential for environmental impact which was not already reviewed under the EAs or the EIS. The SEKI Superintendent determined that the Packer Permits for 2008 and 2009 "involve[ed] no construction or potential for new environmental impact" and were therefore entitled to categorical exclusions.  (CUA 002323-2347; CUA 002348-2359).  Because the NPS demonstrated NEPA compliance in relying on the SUMMP, BMP, and GMP in issuing permits, the Court need not assess whether categorical exclusions were appropriate for these permits.