IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

HIGH SIERRA HIKERS ASSOCIATION,     No. C 09-04621 RS

        Plaintiff,

  v.                                          **REMEDY ORDER**

UNITED STATES DEPARTMENT OF
THE INTERIOR, et al.,

        Defendants.
_____/

## I. INTRODUCTION

Following an order granting in part and denying in part the parties' cross-motions for summary judgment, High Sierra Hikers Association ("HSHA") filed a motion for partial vacatur and injunctive relief. This motion addresses the proper remedy for defendants' Wilderness Act violation and requests the imposition of interim measures while the National Park Service ("NPS") completes the requisite necessity finding and finalizes the stock-specific Wilderness Stewardship Plan ("WSP"). NPS responded with its own briefing on remedy, agreeing that both a partial vacatur and interim order were appropriate, but disputing plaintiff's proposed terms. For the following reasons, the motion for partial vacatur and interim relief is granted in part and denied in part as explained below.

## II. FACTUAL BACKGROUND

In late 2007, NPS issued a Record of Decision ("ROD"), adopting the Preferred Alternative promulgated in the agency's General Management Plan ("GMP"). The GMP and ROD provide programmatic guidance to management on a variety of park issues in Sequoia and Kings Canyon National Parks ("SEKI") and commit NPS to developing a WSP for consideration of site-specific wilderness areas and potential modifications to stock use. While that process is underway, the programmatic documents permit stock use up to current levels pursuant to existing park policies. Under these policies, namely the Stock Use Management Plan ("SUMMP") and the Back-country Management Plan ("BMP"), NPS determines the proper annual level of stock use based on the findings of an adaptive management monitoring program. NPS then uses this information to decide how many commercial use authorizations ("CUAs") to issue and whether to grant the annual extension of SEKI's one concession contract (collectively the "Packer Permits").

Plaintiff filed suit alleging the GMP violates both the Wilderness Act and the National Environmental Policy Act ("NEPA"). Specifically, HSHA argued that NPS failed to conduct either the Wilderness Act's requisite necessity finding or NEPA's obligatory environmental impact assessments prior to releasing the GMP or issuing annual Packer Permits. To this effect, HSHA moved for summary judgment. Defendants responded with a cross-motion for summary judgment. After a consolidated hearing, the Court issued an order granting in part and denying in part the cross-motions, explaining that in "issuing the Packer Permits and approving the GMP, the NPS violated the Wilderness Act by failing to conduct the requisite specialized finding, but complied with NEPA by fulfilling the Act's procedural requirements." (Dkt. No. 124 at 1-2). Briefing was then ordered on the issue of remedy.

HSHA thereafter filed a motion for partial vacatur and injunctive relief. NPS responded, conceding that both a vacatur and an injunction are necessary, but proposing alternative terms for the remedies. On the issue of partial vacatur, HSHA seeks an order compelling NPS to complete the specialized finding and to vacate all portions of the GMP and ROD which discuss or provide programmatic direction regarding commercial stock services. NPS objects to plaintiff's proposal, suggesting that it is too broad and affects unnecessary portions of the GMP.

HSHA also recommends specific injunctive measures. Both parties concur that some form of interim relief is critical while NPS completes the Wilderness Act specialized finding as NPS,

prior to oral argument on May 23, 2012, had refused to issue any Packer Permits unless and until so authorized by the Court. At the conclusion of oral argument, the Court authorized the immediate issuance of permits up to 80% of 2007 levels pending entry of this further order.

As to the type and scope of interim relief necessary, however, the parties disagree. HSHA presents three interim measures: (1) a prohibition on the use of commercial services to transport unnecessary items into wilderness areas; (2) a ban on commercial stock grazing in particularly vulnerable meadows; and (3) a limit on stock use to no more than 80% of 2007 levels. NPS believes these proposals are excessive and improperly infringe on the agency's discretion. Instead, it suggests that stock use should be authorized in the interim up to the average of the level for each year from 2005 to 2007. To the extent that some use reduction is warranted, NPS suggests 5% is more appropriate than the 20% HSHA proposes.[1]

Prior to oral argument, NPS advised the Court of legislation entitled the "Sequoia and Kings Canyon National Parks Back-country Access Act." The bill provides, in part, that "the Secretary [of the Interior] shall continue to issue authorizations to provide commercial services for commercial stock operations . . . at use levels determined by the Secretary to be appropriate and subject to any terms and conditions that the Secretary determines to be appropriate." H.R. 4849, 112th Cong. (2012) (the "SEKI Access Act"). Congress recently passed the Act but, due to the Congressional recess, it has apparently not yet reached the President's desk. As explained below, if the legislation is signed into law, the parties are directed to apprise the Court of what effect, if any, that new law will have on the terms of this order.

III. DISCUSSION

A. Partial Vacatur

When an agency's rule is determined to be unlawful, courts generally choose to set it wholly

---

[1] The Back-country Horsemen of California ("BHC"), submitted a petition to file an *amicus curiae* brief in support of defendants. This petition, which has not been opposed, will be granted. Courts may consider amicus briefs when a party has an interest that may be affected by the disposition of this case, is not represented in the matter or has a unique perspective that can supplement the parties' arguments. *CARE v. DARuvter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999) (citing *Miller-Wohl Co. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982)). The BHC support defendants' suggested remedy and presents a distinct and valuable perspective as commercial packers.

aside. *See* 5 U.S.C. § 706(2); *Tinoqui-Chalola Council of Kitanemul & Yowlumne Tejon Indians et al. v. U.S. Dep't of Energy et al.*, 232 F.3d 1200, 1305 (9th Cir. 2000). As a matter of equity, however, courts may alternatively order partial or no vacatur while the rule is remanded for further agency action. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures."); *see, e.g.*, *ICORE, Inc. v. Fed. Commc'ns Comm'n*, 985 F.2d 1081 (D.C. Cir. 1993) (listing cases from a variety of federal circuits where agency actions were remanded without interim vacatur including *W. Oil and Gas v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980)). Such relief is especially appropriate in the environmental context where full interim vacatur "may have unpredictable or irreversible consequences." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, No. 06-4884 SI, 2011 WL 337364, *2 (N.D. Cal. Jan. 29, 2011) (citing *Natural Res. Def. Council v. U.S. Dep't of the Interior*, 275 F. Supp. 2d 1136, 1146 (C.D. Cal. 2002)).

Here, the parties agree that a partial vacatur of both the GMP and ROD is necessary due to NPS's failure to comply with the Wilderness Act's specialized finding requirement, but dispute the extent of such vacatur. HSHA insists the vacatur should cover all portions of the GMP and ROD which provide programmatic direction on the future of commercial stock or "facilitate" commercial stock use, while the NPS contends that only those portions which specifically "authorize" continuing commercial stock in wilderness areas should be set aside. Notably, this disagreement appears to be more semantic than substantive as both parties agree the vacatur must ensure that the upcoming WSP does not rely on the GMP or ROD in analyzing stock-related development. Consequently, the Court hereby vacates all portions of the GMP and ROD which provide: (1) programmatic guidance regarding the type or level of commercial stock services necessary in SEKI's wilderness; or (2) direction as to the need, appropriateness, or size of developments, structures, or facilities used completely or partially for commercial stock services. This includes all references to the future development or installation of stock facilities including, but not limited to, those anticipated in the Ash Mountain/Foothills area, at North Fork, in the South Form and Dillonwood areas, in Mineral King, and to replace the Wolverton station. (Pl's. Ex. 98 at 20418, 20422, 20432, 20400 and Ex. 2 at 20420, 20386, 20400, 20402, 20406, 20410). In order to inform the public of this decision, NPS must post notice of the partial vacatur at the first place on the

agency website where the GMP and ROD appear.  No additional postings, such as on linked material, will be required at this juncture.

B. <u>Order to Complete Specialized Finding in the WSP</u>

In producing the GMP, NPS failed to conduct the Wilderness Act's requisite specialized finding with regard to commercial stock use in SEKI.  HSHA seeks a court order compelling NPS to complete this finding in the upcoming WSP.  Plaintiff further requests that the order limit the WSP to wilderness issues only as a means to streamline the agency's analysis.  According to HSHA, such a limitation will accelerate the review process and prevent unnecessary complications.  Defendants represent that they recognize the need to complete a specialized finding on commercial stock services in the parks' wilderness areas and intend to do so in the upcoming WSP which they represent will be completed by January, 2015.  They argue, however, that it would be illogical and unreasonably intrusive on the agency's administrative process to accept HSHA's proposal and preclude consideration of front-country areas within the WSP alongside analysis of the wilderness.

Under NEPA, "connected" or "cumulative" agency actions must be discussed within the same impact statement.  *See* 40 C.F.R. § 1508.25; *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 999 (9th Cir. 2004); *Earth Island Inst. v. U.S. Forest Serv.,* 351 F.3d 1291, 1306 (9th Cir. 2003).  Determining the exact relationship between management actions "requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 412, (1976) ("Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately."); *see Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) ("Ordinarily, an agency has the discretion to determine the physical scope used for measuring environmental impacts.").

Here, NPS insists that many front-country actions are connected, cumulative, and similar to actions affecting the wilderness.  For example, the construction of front-country stock facilities directly influences the number of animals available for back-country trips.  Consequently, a court order limiting the WSP to consideration of wilderness issues would likely inhibit NPS's ability to comply with NEPA in creating an impact statement which properly addresses stock use in the back-country as well as all connected, cumulative, and similar actions.  *See* 40 C.F.R. § 1508.25.

Although at this time, the agency admits it has not yet determined the extent to which the WSP will tackle front-country matters in the recently completed Public Scoping Comment Summary Report, the agency anticipates much overlap between front and back-country issues. A court order adopting HSHA's proposal would, therefore, improperly infringe on NPS's discretion and technical expertise in defining the scope of its own environmental impact statement. Furthermore, the breadth of the WSP has already been subject to formal public review through the NEPA process. During this review, many members of the public, including HSHA, provided input on the WSP scoping process. Judicial intervention into this process in order to advance HSHA's requests over those of other park visitors would undermine the agency's efforts and detract from the democratic nature of the NEPA process.

NPS rejects HSHA's concerns that the consideration of front-country issues will unnecessarily complicate, confuse and corrupt the WSP. Karen Taylor-Goodrich, SEKI's superintendent, testifies that no additional time is required for the inclusion of front-country issues in the WSP. (Taylor-Goodrich Decl. ¶ 13). HSHA doubts the superintendent's assurances and insists that if front-country issues must be considered in the WSP, NPS should be required to make its specialized finding in a separate document in advance, suggesting December 2013 as a reasonable deadline. Plaintiff's request once again would improperly infringe on the agency's ability to conform to its statutory duties. By artificially bifurcating the assessment of front-country and wilderness issues, the agency would be precluded from considering any nonwilderness issues that overlap with wilderness matters, and thereby impair the comprehensiveness of NPS's requisite specialized findings.

C. Interim Relief

HSHA seeks interim relief pending the completion of both the WSP and the Wilderness Act specialized finding. It specifically requests three interim measures: (1) a prohibition on using commercial stock to transport "unnecessary" items into wilderness areas; (2) a ban on commercial stock grazing in vulnerable areas; and (3) a limitation on commercial stock services to no more than 80% of 2007 levels. NPS agrees that interim relief is appropriate, but objects to HSHA's specific proposals. Instead, the agency recommends permitting commercial stock services in the interim based on a representative level of stock use derived from the 2005-2007 period. NPS further

contends that to the extent a reduction in the level of stock use is necessary, a 5% reduction is more suitable than HSHA's suggested 20%. Pursuant to the Court's request, the parties conferred following oral argument and stipulated to the use of 3,200 stock use nights ("SUNs") as the base level for interim relief.

"A district court has 'broad latitude in fashioning equitable relief when necessary to remedy an established wrong.'" *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641-42 (9th Cir. 2004) (quoting *Natural Res. Def. Council v. Sw. Marine, Inc.,* 236 F.3d 985, 999 (9th Cir. 2000)). In the environmental context, injunctive or interim relief is especially appropriate because "irreparable damage is presumed to flow from a failure properly to evaluate the environmental impact of a major federal action." *Thomas v. Petersen*, 753 F.2d 754, 764 (9th Cir. 1985) (recognizing this presumption for NEPA violations and applying it to an Endangered Species Act violation). Here, plaintiff requests three interim measures which would remain in place until NPS has remedied its Wilderness Act violation within the stock-specific WSP. Such relief is neither preliminary nor permanent in the conventional sense, *S. Yuba River Citizens League v. National Marine Fisheries Service*, 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011), and may only be granted if HSHA can demonstrate that: (1) the suggested measures are necessary to prevent irreparable injury; (2) legal remedies are inadequate to compensate such injury;[2] (3) the balance of hardships weighs in favor of injunctive relief; and (4) the public interest would be served by an injunction. *Id*. at 1052; *see generally Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743, 2756 (2010).

NPS focuses largely on the issue of irreparable injury, contending that HSHA has failed to prove imminent irreparable harm will result in the absence of the requested interim measures. For support, NPS points to the fact that in arguing for injunctive relief, HSHA has only submitted eleven documents from the Administrative Record, eight of which are NPS documents dating back ten years. The three remaining documents are NPS reports from 2007-2009, which, according to defendants, provide no evidence of the need for the implementation of plaintiff's measures to

---

[2] Both parties support entry of interim relief and do not dispute that legal remedies are insufficient in this case. *Cf. Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable.").

REMEDY ORDER
7

preclude harm to the wilderness.[3] HSHA disputes this narrative, insisting that not only have defendants previously conceded that commercial stock use at current levels harms visitors' experiences, but also that in briefing its summary judgment motion, HSHA presented a great deal of evidence on how commercial stock harms SEKI's wilderness resources through hoof-print impacts, water contamination, reduction in animal populations, and the introduction of non-native species.

To be entitled to its requested interim relief, however, it is not enough for HSHA simply to demonstrate that stock use causes environmental harm. Rather, HSHA must show that the interim measures are necessary to prevent irreparable harm *caused* by NPS's specific violation of the Wilderness Act. *S. Yuba River Citizens League*, 804 F. Supp. 2d at 1055-58 ("[P]laintiff is only entitled to an injunction that prevents irreparable harm caused by defendants' violation of the Endangered Species Act."). This is because "injunctive relief must be tailored to remedy the specific harm alleged." *NRDC v. Winter*, 508 F.3d 885, 886 (9th Cir. 2009). Each of the proposed measures must, therefore, be analyzed in relation to the deficiencies previously found in the GMP. *See S. Yuba River Citizens League*, 804 F. Supp. 2d at 1055-58.

1. Prohibition on the Transport of Unnecessary Items into Wilderness Areas

HSHA requests an interim order prohibiting the use of commercial stock to carry tables, chairs, ice chests, and amplified sound players into SEKI's wilderness areas. According to plaintiff, these items conflict with the Wilderness Act's "general policy of maintaining the primitive character" of SEKI. *See High Sierra Hikers Ass'n v. Weingardt*, 521 F. Supp. 2d 1065, 1078 (N.D. Cal. 2007). HSHA argues that NPS's current recommendation to commercial parties only to "use lightweight, compact equipment" is insufficient because it does not fully ban the transport of these "unnecessary" items into the wilderness. (Ex. 131 at 2217). In support, HSHA relies upon four letters from hikers speaking to the impacts of such equipment. Not only do three of these anecdotes date back to before the GMP, but they also fail to establish that without the ban these items will cause imminent irreparable harm. In fact, the letters, and HSHA's accompanying arguments, do not even demonstrate that these items should be classified as "unnecessary." As defendants accurately

---

[3] With its reply brief, HSHA submitted a number of declarations attesting to the likelihood of irreparable harm. NPS objects to these new documents, insisting that they constitute improper supplementary material in violation of Civil Local Rule 7-3. HSHA's reply evidence, however, is not new evidence, but rather a proper response to NPS's opposition arguments and will be considered.

highlight, while HSHA may take that view, many park visitors attest to their value. (*E.g.* Barnes Decl. ¶ 6, Bloom Decl. ¶ 11, Cunningham Decl. ¶ 11, Day Decl. ¶ 12, & Dohnel Decl ¶ 3). Additionally, SEKI Wilderness Coordinator Gregg Fauth explains that some heavy equipment can prevent resource impact. (Fauth Decl. ¶ 7). Fauth further attests that of the 757 current wilderness areas in the National Preservation System, none, to his knowledge, has ever mandated such an item restriction. (Fauth Decl. ¶ 7).

It is not appropriate for one group of park users to impose its vision of wilderness etiquette over others. While plaintiff is correct that the Wilderness Act's purpose is to maintain the primitive nature of park areas, the Ninth Circuit has repeatedly explained that in complying with the Act agencies must engage in a "delicate balancing" because Congress "did not mandate that the Service preserve the wilderness in a museum diorama . . . . Instead, Congress stated that the wilderness was to be preserved as wilderness and made accessible to people, 'devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical uses.'" *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1033 (9th Cir. 2010) (quoting 16 U.S.C. § 1131(a)); *see Wolf Recovery Found. v. U.S. Forest Serv.*, 692 F. Supp. 2d 1264, 1269 (D. Idaho 2010) ("That Act could have directed that the area remain entirely wild and unmanaged, but it did not take that path."). NPS has already struck this balance, permitting some convenience items, while restricting others under the provisions of 36 C.F.R. §§ 2.12, 2.13, 2.14, & 2.34. Plaintiff has, therefore, not shown that irreparable injury will result in the absence of these restrictions and no further intervention is necessary to limit items to conform to HSHA's particular wilderness experience preferences.

2. <u>Ban on Commercial Stock Grazing in Vulnerable Wilderness Areas</u>

In order to avoid future degradation of SEKI's alpine wilderness areas and to remediate past harm, HSHA proposes an interim ban on commercial stock grazing in meadows above 9,700 feet and in Evolution Valley. In support of the higher elevation ban, HSHA refers to a 1996 report by NPS Plant Ecologist Charlie Schelz recommending that meadows over 9,700 feet be closed to grazing. (Ex. 52 at 37291-91). This recommendation, based on a survey of 34 meadows, suggests that some of the higher elevation meadows which show class 2 or 3 production results should potentially be exempt from this grazing prohibition. Notably, in promulgating this recommendation,

REMEDY ORDER
9

Schelz recognized that such a ban would constitute a "drastic[] change in the way stock use is managed" and should, therefore, "be regarded as [a] goal[] for the near future which should be included in the upcoming Wilderness Management Plan." (*Id.*).

As suggested by the report, NPS intends to consider the benefits of a higher elevation grazing ban during preparation of the WSP. The agency insists, however, that it is premature to impose such a prohibition now. In fact, NPS contends that such a ban could have unintended ecological consequences. For example, if commercial stock cannot graze in higher meadows, lower meadows will be burdened, especially so on both the Pacific Crest Trail where, under HSHA's proposal, grazing would be limited to a single meadow in the park, and on the John Muir Trail where no grazing spots would be available. (Haultain Decl. ¶ 33 citing Exs. 22 & 24). Furthermore, if there is more limited grazing, packers will be forced to carry animal livestock feed on the backs of additional animals. One packer estimates that if HSHA's grazing limitation is adopted, on an eight day trip with twelve animals, an additional sixteen mules would be needed to carry 2,400 pounds of food to feed all twelve animals. Additionally, to feed the sixteen mules, even more stock would be required. This would "logarithmically increase the number of pack mules on the trail." (London Decl. ¶ 12). Accordingly, although HSHA insists its higher elevation ban will prevent irreparable harm, it appears just as likely to cause unintended environmental consequences. Without further evidence, there is no basis to second guess NPS's technical expertise by adopting this interim measure.

HSHA further requests an interim prohibition on grazing in Evolution Valley where Evolution, Colby, and McClure meadows are located. Plaintiff contends these three meadows are particularly sensitive and will greatly benefit ecologically and aesthetically from a temporary ban. It insists that the park's existing meadow monitoring program is ineffective and must be supplemented with this interim protective measure.

Currently, NPS utilizes the Stock Use and Meadow Management Plan ("SUMMP") and Management Directive ("MD") #9 to protect all of the park's meadows. SUMMP employs an adaptive management system where ecologists, technicians and rangers study resource conditions and present their findings to a decision making committee. The committee then meets annually to review the results and develop action plans to present to SEKI's superintendent. The findings given

1  to the committee are based on four primary sources of data: residual biomass monitoring, stock use
2  monitoring, species composition monitoring, and on-site evaluation of meadow condition. MD #9
3  complements this process by delegating to district rangers the authority to implement short term
4  restrictions on certain park resources.[4]

5       Pursuant to SUMMP and MD #9, the three meadows of concern, Evolution, Colby, and
6  McClure, are subjected to a rest-rotation system. Under this system, at least one out of the three
7  meadows is provided a season of rest from grazing each year. Although, the rotation program is
8  considered to be experimental, according to NPS, it has been flexibly utilized over the years to
9  manage and protect the most vulnerable meadows. For example, the park management in 2011
10 adjusted the rotation schedule to provide additional rest for Colby Meadow, and in 2012 established
11 a ceiling for use in Evolution Meadow while continuing to provide a rest period at Colby. (Haultain
12 Decl. ¶¶ 37-39). As a further measure to protect McClure and Colby, two of the park's wetter
13 meadows, NPS has modified their opening dates on occasion and permitted rangers to take action to
14 prevent detrimental impacts.

15      As evidence advanced by NPS reflects, the existing meadow monitoring program at SEKI is
16 sufficient to protect the meadows in the interim period. The WSP process is underway and is the
17 best setting to address the complex scientific analysis required properly to craft an effective meadow
18 management system. In the meantime, SUMMP and MD #9 can be used in a flexible manner to
19 adjust to the needs of Evolution Valley and other sensitive meadows. Notably, under the NEPA
20 analysis in the prior order, this Court considered these programs, and refused to hold that they
21 ineffectively protected the meadows. Plaintiff has, therefore, failed to establish that these programs
22 are insufficient or that irreparable harm will flow from NPS's Wilderness Act violation should these
23 interim measures not be adopted. Accordingly, HSHA has not carried its burden to warrant the
24 imposition of either a ban on higher elevation grazing or a prohibition on grazing in Evolution
25 Valley.

26      3. Limitation on Commercial Stock Services in the Interim Period[5]

---

[4] The distinction between the two plans is best exemplified by an example: decisions as to meadow opening dates for grazing are made by the SUMMP committee, while temporary closures of meadows to grazing during a certain season are orchestrated by park rangers pursuant to MD #9.
[5] As previously noted, at oral argument, counsel was instructed that in the event the Sequoia and Kings Canyon National Parks Back-country Access Act is signed into law, they are to provide the

REMEDY ORDER
11

The final interim measure sought by HSHA is a 20% reduction in commercial stock services. Under this proposal, NPS would have the authority to issue Packer Permits immediately up to 80% of the stipulated baseline of 3,200 SUNs. Unlike in previous years, however, this 80% ceiling would include day use. HSHA also requests that NPS be forced to develop, by July 15, 2012, an effective mechanism to track stock use levels in real time so that the 80% limit is not surpassed. If the July deadline is not met, commercial stock use would be fully suspended. NPS insists these measures are excessive and, alternatively, proposes an order authorizing the issuance of Packer Permits at 3,200 SUNs, without any reduction. The agency further contends that including day stock use in the limitation is unnecessary as day rides have little to no impact on the wilderness areas at issue. The agency additionally objects to HSHA's contention that real time monitoring is necessary. The three issues in dispute, therefore, are whether, during the interim period while NPS completes the WSP, (1) there need be any reduction from the agreed upon baseline of 3,200 SUNs, (2) stock days should be included in this assessment, and (3) NPS should be required to implement further monitoring programs to ensure compliance with the interim order.

a. Reduction

As described above, NPS has not yet determined that any commercial stock use is necessary under the Wilderness Act. All commercial stock use in the interim, therefore, could be subject to restriction. *See, e.g.*, *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1099 (E.D. Wash. 2006) (preventing all snowmobiling and grooming pending agency's statutory compliance); *Sierra Club v. Eubanks*, 335 F. Supp. 2d 1070, 1084 (E.D. Cal 2004) (imposing a preliminary injunction preventing defendants from offering any timber for sale or awarding any timber sale contracts whatsoever); *Or. Natural Res. Council Fund v. Forsgren*, 252 F. Supp. 2d 1088, 1107 (D. Or. 2003) (preventing 100% of timber sale activities in the interim period); *Coal. For Canyon Pres. v. Slater*, 33 F. Supp. 2d 1276, 1281 (D. Mont. 1999) (enjoining agencies from authorizing any tree removal or other site preparations pending completion of NEPA compliant statements). HSHA, however, seeks only to limit stock use to 80% of the stipulated level. Regardless, NPS contends that even a 20% reduction is excessive because park visitors and packers should not be punished for the

Court with supplemental briefing on the impact of this legislation on the imposed interim relief. The parties are to submit their briefs, each not to exceed ten pages in length, within twenty days of the statute's enactment.

1  agency's statutory violation. It, therefore, insists that no reduction is required during the interim
2  period while NPS prepares the WSP. In the alternative, to the extent that some reduction is
3  warranted, defendants argue a 5% reduction is more appropriate. NPS insists that if stock use
4  remains at a more reasonable 95% level, many personal, recreational, and financially adverse
5  impacts will be avoided.

6  These potential consequences are real and must be considered when crafting the appropriate
7  injunctive relief. As expressed in a number of declarations, many packers rely on commercial stock
8  trips within the SEKI wilderness for the survival of their businesses and the thriving of their
9  communities. (*E.g.* Bloom Decl. ¶ 7, Winchester Decl. ¶ 10, Barnes Decl. ¶ 4). These individual
10 anecdotes, however, must be balanced against the environmental damage caused by NPS's
11 Wilderness Act violations. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738
12 (9th Cir. 2000) *abrogation on other grounds recognized by Monsanto Co. v. Geertson Seed Farms*,
13 130 S.Ct. 2743 (2010) (determining that the impact of loss of revenues does not outweigh potential
14 irreparable environmental damage).

15 In *High Sierra Hikers Ass'n v. Powell*, a case with similar facts, the Court completed this
16 balancing and determined that, despite the potential adverse financial impact on packers and the
17 local economy, an interim injunction reducing commercial stock use by 20% was appropriate. No.
18 C-00-01239-EDL, 2001 WL 1382176, at *8 (N.D. Cal. Nov. 1, 2001). There, after determining
19 defendants violated the National Forest Management Act and NEPA, the Court acknowledged the
20 environmental risk which could arise from the continued issuance of stock use permits without
21 statutory compliance. *Id.* at *4. Consequently, the Court ordered the Forest Service to complete the
22 NEPA process within a four year period and implemented a variety of measures in the interim. As
23 mentioned, these measures included a 20% reduction for service day allocation for pack-supported
24 overnight use, as well as, the implementation of trailhead quotas, and a limitation on stock party size
25 to twelve people and twenty animals. *Id.* at *8-*9.[6] Here, HSHA argues, a 20% reduction is
26 similarly warranted to account for the potential degradation of SEKI wilderness arising from the
27 improper issuance of Packer Permits pursuant to the GMP.

---

[6] The Ninth Circuit upheld the terms of this injunction in *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004).

NPS disputes this conclusion, invoking *High Sierra Hikers Ass'n v. Moore* for support. 561 F. Supp. 2d 1107 (N.D. Cal. 2008). There, HSHA brought suit against the Forest Service for violations of the Wilderness Act and NEPA in its assessment of commercial stock and requested broad ranging injunctive relief. Finding statutory violations, the Court granted plaintiff's summary judgment motion and imposed a permanent injunction setting aside the infringing 2005 ROD, reinstating the 2001 park plan, reducing the number of service days for overnight use by 5%, and adopting a variety of others restrictive measures. NPS, thereby, contends that a 5% reduction in stock use is analogously appropriate here. The injunction in *Moore*, however, is easily distinguishable, as it was not imposed as a form of interim relief as in *Powell* or at issue here. Rather, the terms were intended to remain in effect unless and until it was modified or vacated by a subsequent court order. *Id.* at 1120. HSHA's proposed 20% reduction in stock use levels is warranted to prevent excessive damage to SEKI in the interim period. Such a reduction is not unreasonable as, pursuant to the parties' agreed upon baseline of 3,200 SUNs, it authorizes up to 2,560 SUNs, a number which exceeds the levels from 2011.

        b. <u>Inclusion of Stock Days</u>

Commercial stock services consist of SUNs as well as stock days. A SUN is defined as one animal staying in SEKI wilderness for one night. A stock day is when a commercial animal enters the wilderness for any portion of a day but does not remain overnight. Stock days include spot trips, when visitors are transported on horseback from front-country to back-country or vice versa, dunnage trips, when gear or food is transported to a specific location in the wilderness, and day-rides. At present, NPS largely relies only on SUNs to determine proper annual stock levels, on the theory that stock days inflict significantly less impact on the environment. (Pls.' Ex. 106 at 6151).

Beginning in 2005, however, NPS began monitoring stock days and continues to develop this new tracking system. As a result, the agency determined that the average number of stock use days in 2005-2007 was 884. Notably, this calculation does not include stock days that consist of day-rides because such groups rarely enter the SEKI wilderness and are largely incidental. (Fauth Decl. ¶¶ 17-18). Nevertheless, HSHA insists that the Wilderness Act does not distinguish between SUNs and stock days and it is, therefore, essential to require NPS to compile more inclusive data regarding annual commercial stock days and to order a 20% reduction to this number alongside the

reduction in SUNs. Plaintiff, however, presents no evidence that a limitation on stock use days is necessary to prevent irreparable harm. It has therefore not met its burden. *S. Yuba River Citizens League*, 804 F. Supp. 2d at 1062 ("Plaintiff did not carry its burden of showing that irreparable harm will occur in the absence of an injunction requiring this component."). In any event, NPS should employ best efforts to reduce stock days in the interim and continue the development of its stock day monitoring program. *Cf. Powell*, 2001 WL 1382176, at *8 (N.D. Cal. Nov. 1, 2001) (reducing SUNs by 20% while advising defendants to "use best efforts to reduce use of service days").

    c. <u>Compliance Monitoring</u>

  HSHA contends the agency's current system is inadequate and cannot be relied upon to implement the court-ordered interim limits. It recommends requiring NPS to create a more dependable monitoring mechanism which tracks commercial stock use in real time. This system would require each permit holder to submit the number of stock, clients and staff as well as the itinerary and type of excursion before the trip begins. This information would then be entered into the database and would help ensure the interim limits are not exceeded. As part of this new system, HSHA recommends that NPS should punish all commercial stock providers who fail to provide the required information with a suspension of thirty days on any first offense and ninety days for a second offense. On a third offense, the operator would be prohibited from running further trips during the interim period. As a final compliance measure, HSHA requests reports from NPS containing the specifics of each stock trip within seven days of the trip's entry into the SEKI wilderness.

  HSHA's proposal would represent an unwarranted intrusion into NPS's daily management. At present, NPS monitors stock levels with a wide variety of regulations imposed by both NPS and the United States Forest Service ("USFS"). These regulations include park law enforcement, resource protection programs, and the compilation of ranger reports. The agencies also receive monthly and annual use data from commercial stock service providers. While such reporting is not perfect because some operators apparently neglect to submit data in a timely fashion, NPS has implemented an educational and enforcement system to improve on such failures. For example, NPS suspended the permits of Golden Trout and Lost Valley Pack Station after each was late in submitting use information. As a further measure, the agency cross-checks the packers' reports with

on-site ranger monitoring information and data from check-points within SEKI. There is little support, therefore, for the contention that this system is insufficient. Accordingly, imposing HSHA's requested measures would only serve to hamper NPS and USFS in the exercise of their discretion and potentially frustrate SEKI's existing monitoring program. *Cf. Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1257-58 (E.D. Cal. 1999) (denying injunctive relief in the form of an oversight committee to ensure environmental compliance).

At oral argument, NPS represented its willingness to develop an improved monitoring system in order to ensure compliance with the imposed interim relief. NPS is to provide the Court with an outline of its proposed monitoring program within ten days of the issuance of this order. If plaintiff objects to NPS's proposal, it may submit a response within seven days of the receipt of defendants' plan.

## IV. CONCLUSION

Plaintiff's motion for partial vacatur and injunctive relief is granted under the following terms:

1. The Court hereby vacates all portions of the GMP and ROD which provide programmatic guidance regarding the type or level of commercial stock services necessary in the SEKI wilderness area or direction as to the need, appropriateness, or size of developments, structures, or facilities used completely or partially for commercial stock services. This includes all references to the future development or installation of stock facilities.

2. NPS shall complete the WSP and the specialized Wilderness Act finding no later than January 31, 2015. The WSP may consider both front-country and back-country matters as required under NEPA and other statutory guidelines. In conducting the analysis, the agency must consider imposing limits on group size, number of stock, trail suitability for various stock use types and the necessity of additional stock use facilities.

3. Pending completion of the WSP, the following interim measures shall apply:

    a. A total number of commercial stock use permits may be authorized for SUNs equivalent to 80% of 3,200 SUNs. NPS shall use its best efforts to continue to monitor and reduce use of service days.

    b. For the entirety of the interim period before NPS completes the WSP and the

   Wilderness Act findings, commercial stock operations cannot occur except under the terms and conditions of this order, and under any NPS directives which are consistent with this order.

  c. Nothing in this order prevents NPS from permitting new commercial outfits, such as those utilizing burro or llama packers from competing with existing permit holders to provide commercial stock services.

4. If the Sequoia and Kings Canyon National Parks Back-country Access Act is signed into law, the parties are to submit separate briefs, each not to exceed ten pages in length, within twenty days of the statute's enactment directed to the effect, if any, of such law on the terms and conditions set forth in this order.

5. The motion by BHC to file an *amicus curiae* brief is granted.

6. All other interim relief requested by HSHA is denied.

IT IS SO ORDERED.

Dated: 5/29/12

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE