1
2
3
4
5
6
7

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

HIGH SIERRA HIKERS ASSOCIATION,                    No. C 09-04621 RS

          Plaintiff,
     v.                                            **REMEDY ORDER**

UNITED STATES DEPARTMENT OF
THE INTERIOR, et al.,

          Defendants.
————————————————————————/

## I.  INTRODUCTION

Following an order granting in part and denying in part the parties' cross-motions for

summary judgment, High Sierra Hikers Association ("HSHA") filed a motion for partial vacatur and

injunctive relief.  This motion addresses the proper remedy for defendants' Wilderness Act violation

and requests the imposition of interim measures while the National Park Service ("NPS") completes

the requisite necessity finding and finalizes the stock-specific Wilderness Stewardship Plan

("WSP").  NPS responded with its own briefing on remedy, agreeing that both a partial vacatur and

interim order were appropriate, but disputing plaintiff's proposed terms.  For the following reasons,

the motion for partial vacatur and interim relief is granted in part and denied in part as explained

below.

## II.  FACTUAL BACKGROUND

**United States District Court**
For the Northern District of California

1    In late 2007, NPS issued a Record of Decision ("ROD"), adopting the Preferred Alternative

2   promulgated in the agency's General Management Plan ("GMP").  The GMP and ROD provide

3   programmatic guidance to management on a variety of park issues in Sequoia and Kings Canyon

4   National Parks ("SEKI") and commit NPS to developing a WSP for consideration of site-specific

5   wilderness areas and potential modifications to stock use.  While that process is underway, the

6   programmatic documents permit stock use up to current levels pursuant to existing park policies.

7   Under these policies, namely the Stock Use Management Plan ("SUMMP") and the Back-country

8   Management Plan ("BMP"), NPS determines the proper annual level of stock use based on the

9   findings of an adaptive management monitoring program.  NPS then uses this information to decide

10   how many commercial use authorizations ("CUAs") to issue and whether to grant the annual

11   extension of SEKI's one concession contract (collectively the "Packer Permits").

12    Plaintiff filed suit alleging the GMP violates both the Wilderness Act and the National

13   Environmental Policy Act ("NEPA").  Specifically, HSHA argued that NPS failed to conduct either

14   the Wilderness Act's requisite necessity finding or NEPA's obligatory environmental impact

15   assessments prior to releasing the GMP or issuing annual Packer Permits.  To this effect, HSHA

16   moved for summary judgment.  Defendants responded with a cross-motion for summary judgment.

17   After a consolidated hearing, the Court issued an order granting in part and denying in part the

18   cross-motions, explaining that in "issuing the Packer Permits and approving the GMP, the NPS

19   violated the Wilderness Act by failing to conduct the requisite specialized finding, but complied

20   with NEPA by fulfilling the Act's procedural requirements."  (Dkt. No. 124 at 1-2).  Briefing was

21   then ordered on the issue of remedy.

22    HSHA thereafter filed a motion for partial vacatur and injunctive relief.  NPS responded,

23   conceding that both a vacatur and an injunction are necessary, but proposing alternative terms for

24   the remedies.  On the issue of partial vacatur, HSHA seeks an order compelling NPS to complete the

25   specialized finding and to vacate all portions of the GMP and ROD which discuss or provide

26   programmatic direction regarding commercial stock services.  NPS objects to plaintiff's proposal,

27   suggesting that it is too broad and affects unnecessary portions of the GMP.

28    HSHA also recommends specific injunctive measures.  Both parties concur that some form

of interim relief is critical while NPS completes the Wilderness Act specialized finding as NPS,

United States District Court

For the Northern District of California

1  prior to oral argument on May 23, 2012, had refused to issue any Packer Permits unless and until so

2  authorized by the Court.  At the conclusion of oral argument, the Court authorized the immediate

3  issuance of permits up to 80% of 2007 levels pending entry of this further order.

4  　　　　As to the type and scope of interim relief necessary, however, the parties disagree.  HSHA

5  presents three interim measures: (1) a prohibition on the use of commercial services to transport

6  unnecessary items into wilderness areas; (2) a ban on commercial stock grazing in particularly

7  vulnerable meadows; and (3) a limit on stock use to no more than 80% of 2007 levels.  NPS

8  believes these proposals are excessive and improperly infringe on the agency's discretion.  Instead,

9  it suggests that stock use should be authorized in the interim up to the average of the level for each

10  year from 2005 to 2007.  To the extent that some use reduction is warranted, NPS suggests 5% is

11  more appropriate than the 20% HSHA proposes.[1]

12  　　　　Prior to oral argument, NPS advised the Court of legislation entitled the "Sequoia and Kings

13  Canyon National Parks Back-country Access Act."  The bill provides, in part, that "the Secretary [of

14  the Interior] shall continue to issue authorizations to provide commercial services for commercial

15  stock operations . . . at use levels determined by the Secretary to be appropriate and subject to any

16  terms and conditions that the Secretary determines to be appropriate."  H.R. 4849, 112th Cong.

17  (2012) (the "SEKI Access Act").  Congress recently passed the Act but, due to the Congressional

18  recess, it has apparently not yet reached the President's desk.  As explained below, if the legislation

19  is signed into law, the parties are directed to apprise the Court of what effect, if any, that new law

20  will have on the terms of this order.

21  　　　　　　　　　　　　　　　　　　III.  DISCUSSION

22  　　A.  Partial Vacatur

23  　　　　When an agency's rule is determined to be unlawful, courts generally choose to set it wholly

24  

25  [1] The Back-country Horsemen of California ("BHC"), submitted a petition to file an *amicus curiae* brief in support of defendants.  This petition, which has not been opposed, will be granted.  Courts may consider amicus briefs when a party has an interest that may be affected by the disposition of

26  this case, is not represented in the matter or has a unique perspective that can supplement the

27  parties' arguments.  *CARE v. DARuvter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999) (citing *Miller-Wohl Co. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982)).  The

28  BHC support defendants' suggested remedy and presents a distinct and valuable perspective as commercial packers.

**United States District Court**
For the Northern District of California

1  aside.  *See* 5 U.S.C. § 706(2); *Tinoqui-Chalola Council of Kitanemul & Yowlumne Tejon Indians et*

2  *al. v. U.S. Dep't of Energy et al.*, 232 F.3d 1200, 1305 (9th Cir. 2000).  As a matter of equity,

3  however, courts may alternatively order partial or no vacatur while the rule is remanded for further

4  agency action.  *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen

5  equity demands, the regulation can be left in place while the agency follows the necessary

6  procedures."); *see, e.g.*, *ICORE, Inc. v. Fed. Commc'ns Comm'n*, 985 F.2d 1081 (D.C. Cir. 1993)

7  (listing cases from a variety of federal circuits where agency actions were remanded without interim

8  vacatur including *W. Oil and Gas v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980)).  Such relief is

9  especially appropriate in the environmental context where full interim vacatur "may have

10  unpredictable or irreversible consequences."  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,

11  No. 06-4884 SI, 2011 WL 337364, *2 (N.D. Cal. Jan. 29, 2011) (citing *Natural Res. Def. Council v.*

12  *U.S. Dep't of the Interior*, 275 F. Supp. 2d 1136, 1146 (C.D. Cal. 2002)).

13       Here, the parties agree that a partial vacatur of both the GMP and ROD is necessary due to

14  NPS's failure to comply with the Wilderness Act's specialized finding requirement, but dispute the

15  extent of such vacatur.  HSHA insists the vacatur should cover all portions of the GMP and ROD

16  which provide programmatic direction on the future of commercial stock or "facilitate" commercial

17  stock use, while the NPS contends that only those portions which specifically "authorize"

18  continuing commercial stock in wilderness areas should be set aside.  Notably, this disagreement

19  appears to be more semantic than substantive as both parties agree the vacatur must ensure that the

20  upcoming WSP does not rely on the GMP or ROD in analyzing stock-related development.

21  Consequently, the Court hereby vacates all portions of the GMP and ROD which provide: (1)

22  programmatic guidance regarding the type or level of commercial stock services necessary in

23  SEKI's wilderness; or (2) direction as to the need, appropriateness, or size of developments,

24  structures, or facilities used completely or partially for commercial stock services.  This includes all

25  references to the future development or installation of stock facilities including, but not limited to,

26  those anticipated in the Ash Mountain/Foothills area, at North Fork, in the South Form and

27  Dillonwood areas, in Mineral King, and to replace the Wolverton station.  (Pl's. Ex. 98 at 20418,

28  20422, 20432, 20400 and Ex. 2 at 20420, 20386, 20400, 20402, 20406, 20410).  In order to inform

the public of this decision, NPS must post notice of the partial vacatur at the first place on the

United States District Court

For the Northern District of California

1  agency website where the GMP and ROD appear.  No additional postings, such as on linked

2  material, will be required at this juncture.

3      B.  Order to Complete Specialized Finding in the WSP

4      In producing the GMP, NPS failed to conduct the Wilderness Act's requisite specialized

5  finding with regard to commercial stock use in SEKI.  HSHA seeks a court order compelling NPS to

6  complete this finding in the upcoming WSP.  Plaintiff further requests that the order limit the WSP

7  to wilderness issues only as a means to streamline the agency's analysis.  According to HSHA, such

8  a limitation will accelerate the review process and prevent unnecessary complications.  Defendants

9  represent that they recognize the need to complete a specialized finding on commercial stock

10  services in the parks' wilderness areas and intend to do so in the upcoming WSP which they

11  represent will be completed by January, 2015.  They argue, however, that it would be illogical and

12  unreasonably intrusive on the agency's administrative process to accept HSHA's proposal and

13  preclude consideration of front-country areas within the WSP alongside analysis of the wilderness.

14      Under NEPA, "connected" or "cumulative" agency actions must be discussed within the

15  same impact statement.  *See* 40 C.F.R. § 1508.25; *Klamath-Siskiyou Wildlands Ctr. v. Bureau of*

16  *Land Mgmt.*, 387 F.3d 989, 999 (9th Cir. 2004); *Earth Island Inst. v. U.S. Forest Serv.,* 351 F.3d

17  1291, 1306 (9th Cir. 2003).  Determining the exact relationship between management actions

18  "requires a high level of technical expertise and is properly left to the informed discretion of the

19  responsible federal agencies."  *Kleppe v. Sierra Club*, 427 U.S. 390, 412, (1976) ("Absent a

20  showing of arbitrary action, we must assume that the agencies have exercised this discretion

21  appropriately."); *see Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002)

22  ("Ordinarily, an agency has the discretion to determine the physical scope used for measuring

23  environmental impacts.").

24      Here, NPS insists that many front-country actions are connected, cumulative, and similar to

25  actions affecting the wilderness.  For example, the construction of front-country stock facilities

26  directly influences the number of animals available for back-country trips.  Consequently, a court

27  order limiting the WSP to consideration of wilderness issues would likely inhibit NPS's ability to

28  comply with NEPA in creating an impact statement which properly addresses stock use in the back-

country as well as all connected, cumulative, and similar actions.  *See* 40 C.F.R. § 1508.25.

United States District Court

For the Northern District of California

1    Although at this time, the agency admits it has not yet determined the extent to which the WSP will

2    tackle front-country matters in the recently completed Public Scoping Comment Summary Report,

3    the agency anticipates much overlap between front and back-country issues.  A court order adopting

4    HSHA's proposal would, therefore, improperly infringe on NPS's discretion and technical expertise

5    in defining the scope of its own environmental impact statement.  Furthermore, the breadth of the

6    WSP has already been subject to formal public review through the NEPA process.  During this

7    review, many members of the public, including HSHA, provided input on the WSP scoping process.

8    Judicial intervention into this process in order to advance HSHA's requests over those of other park

9    visitors would undermine the agency's efforts and detract from the democratic nature of the NEPA

10   process.

11       NPS rejects HSHA's concerns that the consideration of front-country issues will

12   unnecessarily complicate, confuse and corrupt the WSP.  Karen Taylor-Goodrich, SEKI's

13   superintendent, testifies that no additional time is required for the inclusion of front-country issues

14   in the WSP.  (Taylor-Goodrich Decl. ¶ 13).  HSHA doubts the superintendent's assurances and

15   insists that if front-country issues must be considered in the WSP, NPS should be required to make

16   its specialized finding in a separate document in advance, suggesting December 2013 as a

17   reasonable deadline.  Plaintiff's request once again would improperly infringe on the agency's

18   ability to conform to its statutory duties.  By artificially bifurcating the assessment of front-country

19   and wilderness issues, the agency would be precluded from considering any nonwilderness issues

20   that overlap with wilderness matters, and thereby impair the comprehensiveness of NPS's requisite

21   specialized findings.

22       C.  Interim Relief

23       HSHA seeks interim relief pending the completion of both the WSP and the Wilderness Act

24   specialized finding.  It specifically requests three interim measures: (1) a prohibition on using

25   commercial stock to transport "unnecessary" items into wilderness areas; (2) a ban on commercial

26   stock grazing in vulnerable areas; and (3) a limitation on commercial stock services to no more than

27   80% of 2007 levels.  NPS agrees that interim relief is appropriate, but objects to HSHA's specific

28   proposals.  Instead, the agency recommends permitting commercial stock services in the interim

based on a representative level of stock use derived from the 2005-2007 period.  NPS further

**United States District Court**
For the Northern District of California

1   contends that to the extent a reduction in the level of stock use is necessary, a 5% reduction is more

2   suitable than HSHA's suggested 20%.  Pursuant to the Court's request, the parties conferred

3   following oral argument and stipulated to the use of 3,200 stock use nights ("SUNs") as the base

4   level for interim relief.

5           "A district court has 'broad latitude in fashioning equitable relief when necessary to remedy

6   an established wrong.'"  *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641-42 (9th Cir.

7   2004) (quoting *Natural Res. Def. Council v. Sw. Marine, Inc.,* 236 F.3d 985, 999 (9th Cir. 2000)).

8   In the environmental context, injunctive or interim relief is especially appropriate because

9   "irreparable damage is presumed to flow from a failure properly to evaluate the environmental

10  impact of a major federal action."  *Thomas v. Petersen*, 753 F.2d 754, 764 (9th Cir. 1985)

11  (recognizing this presumption for NEPA violations and applying it to an Endangered Species Act

12  violation).   Here, plaintiff requests three interim measures which would remain in place until NPS

13  has remedied its Wilderness Act violation within the stock-specific WSP.  Such relief is neither

14  preliminary nor permanent in the conventional sense, *S. Yuba River Citizens League v. National*

15  *Marine Fisheries Service*, 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011), and may only be granted if

16  HSHA can demonstrate that: (1) the suggested measures are necessary to prevent irreparable injury;

17  (2) legal remedies are inadequate to compensate such injury;[2] (3) the balance of hardships weighs in

18  favor of injunctive relief; and (4) the public interest would be served by an injunction.  *Id*. at 1052;

19  *see generally Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743, 2756 (2010).

20          NPS focuses largely on the issue of irreparable injury, contending that HSHA has failed to

21  prove imminent irreparable harm will result in the absence of the requested interim measures.  For

22  support, NPS points to the fact that in arguing for injunctive relief, HSHA has only submitted eleven

23  documents from the Administrative Record, eight of which are NPS documents dating back ten

24  years.  The three remaining documents are NPS reports from 2007-2009, which, according to

25  defendants, provide no evidence of the need for the implementation of plaintiff's measures to

26

27

28  _____
    [2] Both parties support entry of interim relief and do not dispute that legal remedies are insufficient in
    this case. *Cf. Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) ("Environmental
    injury, by its nature, can seldom be adequately remedied by money damages and is often permanent
    or at least of long duration, i.e. irreparable.").

United States District Court
For the Northern District of California

1    preclude harm to the wilderness.[3]  HSHA disputes this narrative, insisting that not only have

2    defendants previously conceded that commercial stock use at current levels harms visitors'

3    experiences, but also that in briefing its summary judgment motion, HSHA presented a great deal of

4    evidence on how commercial stock harms SEKI's wilderness resources through hoof-print impacts,

5    water contamination, reduction in animal populations, and the introduction of non-native species.

6         To be entitled to its requested interim relief, however, it is not enough for HSHA simply to

7    demonstrate that stock use causes environmental harm.  Rather, HSHA must show that the interim

8    measures are necessary to prevent irreparable harm *caused* by NPS's specific violation of the

9    Wilderness Act.  *S. Yuba River Citizens League*, 804 F. Supp. 2d at 1055-58 ("[P]laintiff is only

10   entitled to an injunction that prevents irreparable harm caused by defendants' violation of the

11   Endangered Species Act.").  This is because "injunctive relief must be tailored to remedy the

12   specific harm alleged."  *NRDC v. Winter*, 508 F.3d 885, 886 (9th Cir. 2009).  Each of the proposed

13   measures must, therefore, be analyzed in relation to the deficiencies previously found in the GMP.

14   *See S. Yuba River Citizens League*, 804 F. Supp. 2d at 1055-58.

15        1.   Prohibition on the Transport of Unnecessary Items into Wilderness Areas

16        HSHA requests an interim order prohibiting the use of commercial stock to carry tables,

17   chairs, ice chests, and amplified sound players into SEKI's wilderness areas.  According to plaintiff,

18   these items conflict with the Wilderness Act's "general policy of maintaining the primitive

19   character" of SEKI.  *See High Sierra Hikers Ass'n v. Weingardt*, 521 F. Supp. 2d 1065, 1078 (N.D.

20   Cal. 2007).  HSHA argues that NPS's current recommendation to commercial parties only to "use

21   lightweight, compact equipment" is insufficient because it does not fully ban the transport of these

22   "unnecessary" items into the wilderness.  (Ex. 131 at 2217).  In support, HSHA relies upon four

23   letters from hikers speaking to the impacts of such equipment.  Not only do three of these anecdotes

24   date back to before the GMP, but they also fail to establish that without the ban these items will

25   cause imminent irreparable harm.  In fact, the letters, and HSHA's accompanying arguments, do not

26   even demonstrate that these items should be classified as "unnecessary."  As defendants accurately

27   ───────────────
[3] With its reply brief, HSHA submitted a number of declarations attesting to the likelihood of
28   irreparable harm.  NPS objects to these new documents, insisting that they constitute improper
     supplementary material in violation of Civil Local Rule 7-3.  HSHA's reply evidence, however, is
     not new evidence, but rather a proper response to NPS's opposition arguments and will be
     considered.

1    highlight, while HSHA may take that view, many park visitors attest to their value.  (*E.g.* Barnes

2    Decl. ¶ 6, Bloom Decl. ¶ 11, Cunningham Decl. ¶ 11, Day Decl. ¶ 12, & Dohnel Decl ¶ 3).

3    Additionally, SEKI Wilderness Coordinator Gregg Fauth explains that some heavy equipment can

4    prevent resource impact.  (Fauth Decl. ¶ 7).  Fauth further attests that of the 757 current wilderness

5    areas in the National Preservation System, none, to his knowledge, has ever mandated such an item

6    restriction.  (Fauth Decl. ¶ 7).

7           It is not appropriate for one group of park users to impose its vision of wilderness etiquette

8    over others.  While plaintiff is correct that the Wilderness Act's purpose is to maintain the primitive

9    nature of park areas, the Ninth Circuit has repeatedly explained that in complying with the Act

10   agencies must engage in a "delicate balancing" because Congress "did not mandate that the Service

11   preserve the wilderness in a museum diorama . . . . Instead, Congress stated that the wilderness was

12   to be preserved as wilderness and made accessible to people, 'devoted to the public purposes of

13   recreational, scenic, scientific, educational, conservation, and historical uses.'"  *Wilderness Watch,*

14   *Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1033 (9th Cir. 2010) (quoting 16 U.S.C. §

15   1131(a)); *see Wolf Recovery Found. v. U.S. Forest Serv.*, 692 F. Supp. 2d 1264, 1269 (D. Idaho

16   2010) ("That Act could have directed that the area remain entirely wild and unmanaged, but it did

17   not take that path.").  NPS has already struck this balance, permitting some convenience items,

18   while restricting others under the provisions of 36 C.F.R. §§ 2.12, 2.13, 2.14, & 2.34.  Plaintiff has,

19   therefore, not shown that irreparable injury will result in the absence of these restrictions and no

20   further intervention is necessary to limit items to conform to HSHA's particular wilderness

21   experience preferences.

22          2.   Ban on Commercial Stock Grazing in Vulnerable Wilderness Areas

23          In order to avoid future degradation of SEKI's alpine wilderness areas and to remediate past

24   harm, HSHA proposes an interim ban on commercial stock grazing in meadows above 9,700 feet

25   and in Evolution Valley.  In support of the higher elevation ban, HSHA refers to a 1996 report by

26   NPS Plant Ecologist Charlie Schelz recommending that meadows over 9,700 feet be closed to

27   grazing.  (Ex. 52 at 37291-91).  This recommendation, based on a survey of 34 meadows, suggests

28   that some of the higher elevation meadows which show class 2 or 3 production results should

     potentially be exempt from this grazing prohibition.  Notably, in promulgating this recommendation,

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    Schelz recognized that such a ban would constitute a "drastic[] change in the way stock use is

2    managed" and should, therefore, "be regarded as [a] goal[] for the near future which should be

3    included in the upcoming Wilderness Management Plan." (*Id.*).

4        As suggested by the report, NPS intends to consider the benefits of a higher elevation

5    grazing ban during preparation of the WSP.  The agency insists, however, that it is premature to

6    impose such a prohibition now.  In fact, NPS contends that such a ban could have unintended

7    ecological consequences.  For example, if commercial stock cannot graze in higher meadows, lower

8    meadows will be burdened, especially so on both the Pacific Crest Trail where, under HSHA's

9    proposal, grazing would be limited to a single meadow in the park, and on the John Muir Trail

10   where no grazing spots would be available.  (Haultain Decl. ¶ 33 citing Exs. 22 & 24).  Furthermore,

11   if there is more limited grazing, packers will be forced to carry animal livestock feed on the backs of

12   additional animals.  One packer estimates that if HSHA's grazing limitation is adopted, on an eight

13   day trip with twelve animals, an additional sixteen mules would be needed to carry 2,400 pounds of

14   food to feed all twelve animals.  Additionally, to feed the sixteen mules, even more stock would be

15   required.  This would "logarithmically increase the number of pack mules on the trail."  (London

16   Decl. ¶ 12).  Accordingly, although HSHA insists its higher elevation ban will prevent irreparable

17   harm, it appears just as likely to cause unintended environmental consequences.  Without further

18   evidence, there is no basis to second guess NPS's technical expertise by adopting this interim

19   measure.

20       HSHA further requests an interim prohibition on grazing in Evolution Valley where

21   Evolution, Colby, and McClure meadows are located.  Plaintiff contends these three meadows are

22   particularly sensitive and will greatly benefit ecologically and aesthetically from a temporary ban.  It

23   insists that the park's existing meadow monitoring program is ineffective and must be supplemented

24   with this interim protective measure.

25       Currently, NPS utilizes the Stock Use and Meadow Management Plan ("SUMMP") and

26   Management Directive ("MD") #9 to protect all of the park's meadows.  SUMMP employs an

27   adaptive management system where ecologists, technicians and rangers study resource conditions

28   and present their findings to a decision making committee.  The committee then meets annually to

review the results and develop action plans to present to SEKI's superintendent.  The findings given

**United States District Court**
For the Northern District of California

1    to the committee are based on four primary sources of data: residual biomass monitoring, stock use

2    monitoring, species composition monitoring, and on-site evaluation of meadow condition.  MD #9

3    complements this process by delegating to district rangers the authority to implement short term

4    restrictions on certain park resources.[4]

5          Pursuant to SUMMP and MD #9, the three meadows of concern, Evolution, Colby, and

6    McClure, are subjected to a rest-rotation system.  Under this system, at least one out of the three

7    meadows is provided a season of rest from grazing each year.  Although, the rotation program is

8    considered to be experimental, according to NPS, it has been flexibly utilized over the years to

9    manage and protect the most vulnerable meadows.  For example, the park management in 2011

10   adjusted the rotation schedule to provide additional rest for Colby Meadow, and in 2012 established

11   a ceiling for use in Evolution Meadow while continuing to provide a rest period at Colby.  (Haultain

12   Decl. ¶¶ 37-39).  As a further measure to protect McClure and Colby, two of the park's wetter

13   meadows, NPS has modified their opening dates on occasion and permitted rangers to take action to

14   prevent detrimental impacts.

15         As evidence advanced by NPS reflects, the existing meadow monitoring program at SEKI is

16   sufficient to protect the meadows in the interim period.  The WSP process is underway and is the

17   best setting to address the complex scientific analysis required properly to craft an effective meadow

18   management system.  In the meantime, SUMMP and MD #9 can be used in a flexible manner to

19   adjust to the needs of Evolution Valley and other sensitive meadows.  Notably, under the NEPA

20   analysis in the prior order, this Court considered these programs, and refused to hold that they

21   ineffectively protected the meadows.  Plaintiff has, therefore, failed to establish that these programs

22   are insufficient or that irreparable harm will flow from NPS's Wilderness Act violation should these

23   interim measures not be adopted.  Accordingly, HSHA has not carried its burden to warrant the

24   imposition of either a ban on higher elevation grazing or a prohibition on grazing in Evolution

25   Valley.

26         3.   Limitation on Commercial Stock Services in the Interim Period[5]

27   _____
     [4] The distinction between the two plans is best exemplified by an example: decisions as to meadow
28   opening dates for grazing are made by the SUMMP committee, while temporary closures of
     meadows to grazing during a certain season are orchestrated by park rangers pursuant to MD #9.
     [5] As previously noted, at oral argument, counsel was instructed that in the event the Sequoia and
     Kings Canyon National Parks Back-country Access Act is signed into law, they are to provide the

United States District Court

For the Northern District of California

1    The final interim measure sought by HSHA is a 20% reduction in commercial stock services.

2  Under this proposal, NPS would have the authority to issue Packer Permits immediately up to 80%

3  of the stipulated baseline of 3,200 SUNs.  Unlike in previous years, however, this 80% ceiling

4  would include day use.  HSHA also requests that NPS be forced to develop, by July 15, 2012, an

5  effective mechanism to track stock use levels in real time so that the 80% limit is not surpassed.  If

6  the July deadline is not met, commercial stock use would be fully suspended.  NPS insists these

7  measures are excessive and, alternatively, proposes an order authorizing the issuance of Packer

8  Permits at 3,200 SUNs, without any reduction.  The agency further contends that including day

9  stock use in the limitation is unnecessary as day rides have little to no impact on the wilderness

10  areas at issue.  The agency additionally objects to HSHA's contention that real time monitoring is

11  necessary.  The three issues in dispute, therefore, are whether, during the interim period while NPS

12  completes the WSP, (1) there need be any reduction from the agreed upon baseline of 3,200 SUNs,

13  (2) stock days should be included in this assessment, and (3) NPS should be required to implement

14  further monitoring programs to ensure compliance with the interim order.

15        a.    Reduction

16    As described above, NPS has not yet determined that any commercial stock use is necessary

17  under the Wilderness Act.  All commercial stock use in the interim, therefore, could be subject to

18  restriction.  *See, e.g.*, *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1099 (E.D. Wash.

19  2006) (preventing all snowmobiling and grooming pending agency's statutory compliance); *Sierra*

20  *Club v. Eubanks*, 335 F. Supp. 2d 1070, 1084 (E.D. Cal 2004) (imposing a preliminary injunction

21  preventing defendants from offering any timber for sale or awarding any timber sale contracts

22  whatsoever); *Or. Natural Res. Council Fund v. Forsgren*, 252 F. Supp. 2d 1088, 1107 (D. Or. 2003)

23  (preventing 100% of timber sale activities in the interim period); *Coal. For Canyon Pres. v. Slater*,

24  33 F. Supp. 2d 1276, 1281 (D. Mont. 1999) (enjoining agencies from authorizing any tree removal

25  or other site preparations pending completion of NEPA compliant statements).  HSHA, however,

26  seeks only to limit stock use to 80% of the stipulated level.  Regardless, NPS contends that even a

27  20% reduction is excessive because park visitors and packers should not be punished for the

28  ─────────────────────────────────────────

Court with supplemental briefing on the impact of this legislation on the imposed interim relief.
The parties are to submit their briefs, each not to exceed ten pages in length, within twenty days of
the statute's enactment.

United States District Court

For the Northern District of California

1    agency's statutory violation.  It, therefore, insists that no reduction is required during the interim

2    period while NPS prepares the WSP.  In the alternative, to the extent that some reduction is

3    warranted, defendants argue a 5% reduction is more appropriate.  NPS insists that if stock use

4    remains at a more reasonable 95% level, many personal, recreational, and financially adverse

5    impacts will be avoided.

6          These potential consequences are real and must be considered when crafting the appropriate

7    injunctive relief.  As expressed in a number of declarations, many packers rely on commercial stock

8    trips within the SEKI wilderness for the survival of their businesses and the thriving of their

9    communities.  (*E.g.* Bloom Decl. ¶ 7, Winchester Decl. ¶ 10, Barnes Decl. ¶ 4).  These individual

10   anecdotes, however, must be balanced against the environmental damage caused by NPS's

11   Wilderness Act violations.  *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738

12   (9th Cir. 2000) *abrogation on other grounds recognized by Monsanto Co. v. Geertson Seed Farms*,

13   130 S.Ct. 2743 (2010) (determining that the impact of loss of revenues does not outweigh potential

14   irreparable environmental damage).

15         In *High Sierra Hikers Ass'n v. Powell*, a case with similar facts, the Court completed this

16   balancing and determined that, despite the potential adverse financial impact on packers and the

17   local economy, an interim injunction reducing commercial stock use by 20% was appropriate.  No.

18   C-00-01239-EDL, 2001 WL 1382176, at *8 (N.D. Cal. Nov. 1, 2001).  There, after determining

19   defendants violated the National Forest Management Act and NEPA, the Court acknowledged the

20   environmental risk which could arise from the continued issuance of stock use permits without

21   statutory compliance.  *Id.* at *4.  Consequently, the Court ordered the Forest Service to complete the

22   NEPA process within a four year period and implemented a variety of measures in the interim.  As

23   mentioned, these measures included a 20% reduction for service day allocation for pack-supported

24   overnight use, as well as, the implementation of trailhead quotas, and a limitation on stock party size

25   to twelve people and twenty animals.  *Id.* at *8-*9.[6]  Here, HSHA argues, a 20% reduction is

26   similarly warranted to account for the potential degradation of SEKI wilderness arising from the

27   improper issuance of Packer Permits pursuant to the GMP.

28

---

[6] The Ninth Circuit upheld the terms of this injunction in *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004).

**United States District Court**
For the Northern District of California

1    NPS disputes this conclusion, invoking *High Sierra Hikers Ass'n v. Moore* for support.  561

2  F. Supp. 2d 1107 (N.D. Cal. 2008).  There, HSHA brought suit against the Forest Service for

3  violations of the Wilderness Act and NEPA in its assessment of commercial stock and requested

4  broad ranging injunctive relief.  Finding statutory violations, the Court granted plaintiff's summary

5  judgment motion and imposed a permanent injunction setting aside the infringing 2005 ROD,

6  reinstating the 2001 park plan, reducing the number of service days for overnight use by 5%, and

7  adopting a variety of others restrictive measures.  NPS, thereby, contends that a 5% reduction in

8  stock use is analogously appropriate here.  The injunction in *Moore*, however, is easily

9  distinguishable, as it was not imposed as a form of interim relief as in *Powell* or at issue here.

10  Rather, the terms were intended to remain in effect unless and until it was modified or vacated by a

11  subsequent court order.  *Id.* at 1120.  HSHA's proposed 20% reduction in stock use levels is

12  warranted to prevent excessive damage to SEKI in the interim period.  Such a reduction is not

13  unreasonable as, pursuant to the parties' agreed upon baseline of 3,200 SUNs, it authorizes up to

14  2,560 SUNs, a number which exceeds the levels from 2011.

15           b.   Inclusion of Stock Days

16    Commercial stock services consist of SUNs as well as stock days.  A SUN is defined as one

17  animal staying in SEKI wilderness for one night.  A stock day is when a commercial animal enters

18  the wilderness for any portion of a day but does not remain overnight.  Stock days include spot trips,

19  when visitors are transported on horseback from front-country to back-country or vice versa,

20  dunnage trips, when gear or food is transported to a specific location in the wilderness, and day-

21  rides.  At present, NPS largely relies only on SUNs to determine proper annual stock levels, on the

22  theory that stock days inflict significantly less impact on the environment.  (Pls.' Ex. 106 at 6151).

23    Beginning in 2005, however, NPS began monitoring stock days and continues to develop

24  this new tracking system.  As a result, the agency determined that the average number of stock use

25  days in 2005-2007 was 884.  Notably, this calculation does not include stock days that consist of

26  day-rides because such groups rarely enter the SEKI wilderness and are largely incidental.  (Fauth

27  Decl. ¶¶ 17-18).  Nevertheless, HSHA insists that the Wilderness Act does not distinguish between

28  SUNs and stock days and it is, therefore, essential to require NPS to compile more inclusive data

regarding annual commercial stock days and to order a 20% reduction to this number alongside the

United States District Court

For the Northern District of California

reduction in SUNs.  Plaintiff, however, presents no evidence that a limitation on stock use days is necessary to prevent irreparable harm.  It has therefore not met its burden.  *S. Yuba River Citizens League*, 804 F. Supp. 2d at 1062 ("Plaintiff did not carry its burden of showing that irreparable harm will occur in the absence of an injunction requiring this component.").  In any event, NPS should employ best efforts to reduce stock days in the interim and continue the development of its stock day monitoring program.  *Cf. Powell*, 2001 WL 1382176, at *8 (N.D. Cal. Nov. 1, 2001) (reducing SUNs by 20% while advising defendants to "use best efforts to reduce use of service days").

c.   Compliance Monitoring

HSHA contends the agency's current system is inadequate and cannot be relied upon to implement the court-ordered interim limits.  It recommends requiring NPS to create a more dependable monitoring mechanism which tracks commercial stock use in real time.  This system would require each permit holder to submit the number of stock, clients and staff as well as the itinerary and type of excursion before the trip begins.  This information would then be entered into the database and would help ensure the interim limits are not exceeded.  As part of this new system, HSHA recommends that NPS should punish all commercial stock providers who fail to provide the required information with a suspension of thirty days on any first offense and ninety days for a second offense.  On a third offense, the operator would be prohibited from running further trips during the interim period.  As a final compliance measure, HSHA requests reports from NPS containing the specifics of each stock trip within seven days of the trip's entry into the SEKI wilderness.

HSHA's proposal would represent an unwarranted intrusion into NPS's daily management. At present, NPS monitors stock levels with a wide variety of regulations imposed by both NPS and the United States Forest Service ("USFS").  These regulations include park law enforcement, resource protection programs, and the compilation of ranger reports.  The agencies also receive monthly and annual use data from commercial stock service providers.  While such reporting is not perfect because some operators apparently neglect to submit data in a timely fashion, NPS has implemented an educational and enforcement system to improve on such failures.  For example, NPS suspended the permits of Golden Trout and Lost Valley Pack Station after each was late in submitting use information.  As a further measure, the agency cross-checks the packers' reports with

United States District Court

For the Northern District of California

1    on-site ranger monitoring information and data from check-points within SEKI.  There is little

2    support, therefore, for the contention that this system is insufficient.  Accordingly, imposing

3    HSHA's requested measures would only serve to hamper NPS and USFS in the exercise of their

4    discretion and potentially frustrate SEKI's existing monitoring program.  *Cf. Sierra Club v. Babbitt*,

5    69 F. Supp. 2d 1202, 1257-58 (E.D. Cal. 1999) (denying injunctive relief in the form of an oversight

6    committee to ensure environmental compliance).

7            At oral argument, NPS represented its willingness to develop an improved monitoring

8    system in order to ensure compliance with the imposed interim relief.  NPS is to provide the Court

9    with an outline of its proposed monitoring program within ten days of the issuance of this order.  If

10   plaintiff objects to NPS's proposal, it may submit a response within seven days of the receipt of

11   defendants' plan.

### IV.  CONCLUSION

13           Plaintiff's motion for partial vacatur and injunctive relief is granted under the following

14   terms:

15   1.  The Court hereby vacates all portions of the GMP and ROD which provide programmatic

16       guidance regarding the type or level of commercial stock services necessary in the SEKI

17       wilderness area or direction as to the need, appropriateness, or size of developments,

18       structures, or facilities used completely or partially for commercial stock services.  This

19       includes all references to the future development or installation of stock facilities.

20   2.  NPS shall complete the WSP and the specialized Wilderness Act finding no later than

21       January 31, 2015.  The WSP may consider both front-country and back-country matters as

22       required under NEPA and other statutory guidelines.  In conducting the analysis, the agency

23       must consider imposing limits on group size, number of stock, trail suitability for various

24       stock use types and the necessity of additional stock use facilities.

25   3.  Pending completion of the WSP, the following interim measures shall apply:

26       a.  A total number of commercial stock use permits may be authorized for SUNs

27           equivalent to 80% of 3,200 SUNs.  NPS shall use its best efforts to continue to

28           monitor and reduce use of service days.

         b.  For the entirety of the interim period before NPS completes the WSP and the

United States District Court
For the Northern District of California

Wilderness Act findings, commercial stock operations cannot occur except under the terms and conditions of this order, and under any NPS directives which are consistent with this order.

    c.   Nothing in this order prevents NPS from permitting new commercial outfits, such as those utilizing burro or llama packers from competing with existing permit holders to provide commercial stock services.

4. If the Sequoia and Kings Canyon National Parks Back-country Access Act is signed into law, the parties are to submit separate briefs, each not to exceed ten pages in length, within twenty days of the statute's enactment directed to the effect, if any, of such law on the terms and conditions set forth in this order.

5. The motion by BHC to file an *amicus curiae* brief is granted.

6. All other interim relief requested by HSHA is denied.

IT IS SO ORDERED.

Dated: 5/29/12

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE